**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re ) | |
| ) | Case No. 17-20796-TBM |
| NINER, INC. ) | |
| EIN: 52-2448591 ) | Chapter 11 |
| Debtor-in-Possession. ) | |
| ) | |

**MOTION FOR ENTRY OF ORDER (A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 363(b), 363(f) and 363(m); (C) ASSUMING AND ASSIGNING CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO BANKRUPTCY CODE SECTION 365; AND, (D) GRANTING RELATED RELIEF**

Debtor Niner, Inc., debtor and debtor-in-possession herein (the "**Debtor**") in the above-referenced chapter 11 case (the "**Chapter 11 Case**"), files this motion (the **"Sale Motion"**) for the entry of an order: (a) approving the *Asset Purchase Agreement* dated November 27, 2017 (the **"Agreement,"** a copy of which is attached hereto as **Exhibit 1**),[1] between the Debtor, as seller, and Niner Acquisition LLC (the **"Purchaser"**), as buyer, and authorizing the sale (the **"Sale"**) of substantially all of the assets of the Debtor (the "**Purchased Assets**"); (b) authorizing the sale of the Debtor's assets free and clear of all liens, claims, rights, encumbrances, and other interests pursuant to §§ 363(b), 363(f), and 363(m) of the Bankruptcy Code; (c) assuming and assigning certain executory contracts and unexpired leases (the "**Assumed Contracts and Leases**") pursuant to § 365 of the Bankruptcy Code; and, (d) granting related relief.

Concurrently herewith, the Debtor is filing the *Motion for Entry of Order: (a) Approving Bid Procedures for the Sale of Substantially All of the Debtor's Assets; (b) Scheduling an Auction and Sale Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (c) Approving Payment of Break-up Fee and Expense Reimbursement; (d) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and, (e) Granting Related Relief* (the **"Bid Procedures Motion"**), which seeks approval of certain bid procedures and bidder protections (the **"Bid Procedures"**) with respect to the Sale, scheduling an auction (the "**Auction**") for the Purchased Assets and a hearing approving the sale of the Purchased Assets[2] (the "**Sale Hearing**"), and approving certain assignment procedures (the "**Assignment Procedures**"), for the assumption and assignment of certain executory contracts and unexpired leases related to the Purchased Assets, including any and all amendments, modifications and exercised options for renewal of terms relating to such executory contracts and unexpired

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Agreement.

[2] Terms not otherwise defined herein shall have the meaning set forth in the Asset Purchase Agreement.

leases, and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**"), as more particularly set forth therein. In support of this Sale Motion, the Debtor respectfully states as follows:

## Preliminary Statement

1. By this Sale Motion, the Debtor seeks approval of the Sale of the Purchased Assets to the Purchaser, pursuant to the Agreement, or to the highest and best bidder for such Purchased Assets at the Auction provided for in the Bid Procedures Motion and the Bid Procedures, to take place in accordance with the order to be entered by the Court on the Bid Procedures Motion (the "**Bid Procedures Order**"). The proposed Agreement contemplates that the Purchased Assets will be sold free and clear of liens, claims, encumbrances, rights, and other interests other than those liens and interests expressly permitted under the Agreement.

2. As discussed below, the Debtor's sale process is in the best interests of the Debtor and its estate and creditors. The Sale will provide for the payment consisting of: (a) cash in an amount equal to the Obligations owed by Debtor to PMC (the "**PMC Obligations**"), as the term Obligations is defined in that certain Loan and Security Agreement, dated April 23, 2012, between Seller and PMC, as amended, modified or restated from time to time, and encompassing both prepetition and post petition obligations of Seller to PMC as of the Closing Date (the "**PMC Cash Amount**");[3] (b) additional cash in the amount of $100,000 (the "**Additional Cash Amount**"); plus (c) the assumption of the Assumed Liabilities.

## Jurisdiction and Venue

3. The United States Bankruptcy Court for the District of Colorado (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory predicates for the relief sought herein are sections 363, 365, 1107, and 1108 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and L.B.R. 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Colorado (the "**Local Rules**").

## General Background

6. On November 27, 2017 (the "**Petition Date**"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business as debtor and debtor-in-possession pursuant to sections 1107(a) and 1108 of the

---

[3] PMC has agreed that if the stalking horse bidder is the successful bidder for the Purchased Assets, PMC will credit the PMC Cash Amount in an amount equal to $100,600 on account of prepetition default interest, plus $40,000 on account of the closing fee in connection with the debtor in possession financing agreement between PMC and Debtor.

Bankruptcy Code.

7. No request has been made for the appointment of a trustee or an examiner in these cases, and no official committee has yet been appointed by the Office of the United States Trustee.

### Sale of the Purchased Assets

8. The Debtor seeks approval of the sale (the **"Sale"**) of substantially all of its assets, including, *inter alia*, certain described assets and tangible property, Assigned Contracts, permits, intellectual property, claims and other personal property all as more fully set forth in the Agreement and fully defined therein as the "Purchased Assets".

9. Pursuant to the Agreement, the Debtor and the Purchaser propose the following timeline:

- Entry of the Bid Procedures Order no later than **December 8, 2017**.
- Deadline to (a) submit competing bids, (b) object to sale, (c) object to assumption/assignment and cure claim no later than **1:00 p.m. (prevailing Mountain Time) on January 10, 2018**.
- Auction to be held at **1:00 p.m. (prevailing Mountain Time) on January 11, 2018**.
- A half day hearing on the Sale (the **"Sale Hearing"**) to be held between **January 15, 2018 and January 19, 2018 (or such other date thereafter as the Court may be available)**.
- Closing of Sale no later than **January 31, 2018**.

10. In light of the extensive marketing process already undertaken, the additional efforts that will be made during the proposed sale process, and based upon the current financial condition of the business, the timing of the sale proposed herein is reasonable under the circumstances to effectuate a sale to either the Purchaser under the terms of the Agreement or, alternatively, to a higher and better bidder for the Assets. The Debtor believes that the sale process provides sufficient time to fully expose the Purchased Assets for sale in the hope of achieving a competitive bidding process.

### Prepetition Marketing and Sale Efforts

11. The Debtor's assets have been exposed to the market for at least ten months. The Debtor commenced the process of evaluating restructuring and sale options in early 2017 with the hiring of W.G. Nielsen & Co. ("**W.G. Nielsen**") on January 5, 2017, and held their initial meeting. Under the terms of its agreement, W.G. Nielsen explored a sale transaction for the Debtor. Starting in February 2017, W.G. Nielsen contacted 223 potential capital sources all of whom are characterized as institutional investors or large strategic investors. On March 20, 2017, W.G. Nielsen partnered with Keystone Capital Markets, Inc. due to their experience within the mountain biking industry, to approach additional strategic and financial buyers. As of November 2017, W.G. Nielsen received 64 requests for further information. Debtor received 55 executed non-

disclosure agreements and delivered a Confidential Information Memorandum and additional financial information via data room access to those 55 requestors. 43 parties engaged in diligence and entered the data room.

12. The initial timeline called for bids to be received by Friday April 14, 2017, and the Debtor received 3 indications of interest. The Debtor also received 1 letter of intent by that date, which was later withdrawn. From May 22, 2017 through August 11, 2017, W.G. Nielsen re-approached the market contacting additional parties and reengaging with parties that had previously shown interest. W.G. Nielsen requested LOI's and received LOI's from 3 parties. After management presentations from 2 of those parties, LOI's were submitted from July 14, 2017 through August 11, 2017. After further negotiation the Debtor executed an LOI with an affiliate of the Purchaser on August 31, 2017.

13. Since August 31, 2017, the Debtor and an affiliate of the Purchaser have worked to complete due diligence and engage the existing lenders in attempt to work out a mutually beneficial solution. On November 27, 2017, the Debtor entered into an Asset Purchase Agreement with Niner Acquisition LLC as buyer and the initial "stalking horse" bidder.

14. Ultimately, after extensive negotiations, the Debtor and the Purchaser entered into the Agreement. As noted above, the consideration to be paid by Purchaser to Debtor for the Purchased Assets consists of: (a) cash in an amount equal to the PMC Obligations, as the term Obligations is defined in that certain Loan and Security Agreement, dated April 23, 2012, between Seller and PMC, as amended, modified or restated from time to time, and encompassing the PMC Cash Amount;[4] (b) the Additional Cash Amount); plus (c) the assumption of the Assumed Liabilities.

**Continued Marketing Process**

14. W.G. Nielsen intends to streamline the due diligence process going forward. A data room is already and will continue to be available to interested parties who have, or will, execute confidentiality agreements acceptable to the Debtor. The Debtor will continue to respond to inquiries from prospective buyers through the bid deadline approved by the Court for alternative bidders to bid on the Purchased Assets. W.G. Nielsen will re-engage previous potential bidders, and will utilize its extensive personal/company database (consisting of years of complied leasehold buyers) to essentially re-market the Purchased Assets nationwide.

14. While the prepetition marketing and sale process was thorough, as discussed above, the Debtor will send, or will have sent, notice of the Sale Motion and Bid Procedures to all parties that the Debtor believes may be potentially interested in acquiring the Purchased Assets. To assist with this task, and to ensure that the highest and best price is obtained for the Purchased Assets, the Debtor seeks to retain W.G. Nielsen to continue as its marketing agent to solicit for further offers for the Purchased Assets. W.G. Nielsen was involved in the pre-petition marketing of the

---

[4] PMC has agreed that if the stalking horse bidder is the successful bidder for the Purchased Assets, PMC will credit the PMC Cash Amount in an amount equal to $100,600 on account of prepetition default interest, plus $40,000 on account of the closing fee in connection with the debtor in possession financing agreement between PMC and Debtor.

Purchased Assets, and will continue to be responsible for marketing the Purchased Assets. W.G. Nielsen has access to significant resources, ensuring that the Purchased Assets will continue to be marketed on a large scale.

15. In light of the prepetition marketing efforts, and anticipated post-petition marketing efforts, the Debtor believes that the intended sale process provides sufficient time to fully expose the Purchased Assets for sale in the hope of achieving a competitive bidding process. The Debtor believes that the consummation of the Sale to the Purchaser, or other successful bidder, will provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Purchased Assets. Except as otherwise provided in definitive documentation with respect to the Sale, all of the Debtor's rights, title and interest in and to the Purchased Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the **"Claims and Interests"**).

### Agreement with Purchaser

16. The Debtor believes that the consummation of the Sale to the Purchaser or other successful bidder will provide its creditors and other stakeholders with the best opportunity possible for maximizing the value of the Purchased Assets.

17. The key terms of the Agreement and the proposed Sale Order, are summarized below. The description below only summarizes certain provisions of the Agreement and the Sale Order as a convenience to the Court and parties in interest, and the terms of the Agreement control in the event of any inconsistency.

   a. **Purchase Price**. The total consideration to be paid by Purchaser to Debtor for the Purchased Assets consists of (a) cash in an amount equal to the PMC Obligations, as the term Obligations is defined in that certain Loan and Security Agreement, dated April 23, 2012, between Seller and PMC, as amended, modified or restated from time to time, and encompassing the PMC Cash Amount;[5] (b) the Additional Cash Amount); plus (c) the assumption of the Assumed Liabilities. *See* Agreement § 2.7.

   b. **Purchased Assets**. The Purchased Assets include, (a) the Assets and Tangible Property described in Schedule 2.1(a); (b) the Leased Real Property described in Schedule 2.1(b); (c) the Assigned Contracts described in Schedule 2.1(c); (d) the Permits described in Schedule 2.1(d); (e) the Intellectual Property set forth on Schedule 2.1(e); (f) originals, or where not available, copies, of all Documents, Books and Records relating to the Business; (g) all of the rights of Seller under warranties, indemnities and all similar rights against third parties the extent related to the Business; (h) all insurance policies of Seller to the extent related to the Business; (i) deposits,

---

[5] PMC has agreed that if the stalking horse bidder is the successful bidder for the Purchased Assets, PMC will credit the PMC Cash Amount in an amount equal to $100,600 on account of prepetition default interest, plus $40,000 on account of the closing fee in connection with the debtor in possession financing agreement between PMC and Debtor.

prepaids, retainers and similar amounts made to vendors in connection with the Business relating to or arising in connection with any of the Assigned Contracts (collectively, "Deposits"); and (j) all Claims to the extent related to the Purchased Assets described in this Section 2.1(a) or the Assumed Liabilities, but specifically excluding all Claims arising under chapter 5 of the Bankruptcy Code (i) against counterparties who are party to (or Affiliates of a party to) any Assigned Contract, (ii) otherwise arising under or related to the Purchased Assets, or (iii) against Buyer (or Buyer's Affiliates); provided, that the Debtor shall retain the right to assert any such Claims as a defense or objection to proofs of claim asserted against the Debtor or its bankruptcy estate in the Chapter 11 Case. *See* Agreement § 2.1. The Purchased Assets do not include the Excluded Assets or Excluded Contracts. *See* Agreement § 2.2.

c. **Identity of Purchaser.** The Purchaser is Niner Acquisition LLC.

d. **Assumption of Executory Contracts and Unexpired Leases.** The proposed sale contemplates that the Debtor may assume and assign to the Purchaser certain of the executory contracts and unexpired leases associated with the Purchased Assets (*i.e.,* the Assigned Contracts). *See* Agreement § 2.1.

e. **Break Up Fee.** Subject to approval of the Bankruptcy Court, in consideration for the Purchaser having expended considerable time and expense in connection with the Agreement and the negotiation thereof and to compensate Purchaser as a stalking-horse bidder, in the event that the Debtor consummates an alternative transaction instead of the proposed Sale to the Purchaser under the terms of the Agreement, the Debtor shall pay Purchaser a break-up fee in the greater amount of either $100,000 or 3% of the Purchase Price, and an expense reimbursement not to exceed $50,000 (collectively, the **"Break-Up Fee"**). *See* Agreement § 5.12.

f. **Representations, Warranties and Covenants**. The Debtor made various representations customary for a transaction of this kind including, but not limited to, those relating to organization and good standing, authorization and validity, qualification, absence of conflicts, litigation, compliance with legal requirements, environmental matters, title to and use of assets and property, contracts, taxes, intellectual property, and financial statements and reports. *See* Agreement Article 3. The Purchaser has made certain representations, among others, relating to organization, good standing and authorization, absence of conflict, sufficiency of funds, solvency, litigation, and independent investigation. *See* Agreement Article 4.

g. **Conditions.** The Closing is conditioned upon the occurrence of certain events customary for transactions of this kind, including payment in full of the PMC Cash Amount at Closing, the truthfulness of all representations

      and warranties, and all consents and approvals, including approvals of the Bankruptcy Court, having been obtained. *See* Agreement § 5.7.

   h. **Rule 6004/6006 Waiver**. The proposed Sale Order provides that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006. *See* Sale Order ¶ 22. As discussed herein, the sale and prompt consummation thereof are in the best interest of the Debtor and its estate in order to maintain and otherwise maximize the value of the Debtor's assets for the benefit of the estate and its stakeholders and to comply with certain timing deadlines as discussed above.

   i. **Successor Liability Findings.** The Sale Order provides that the Purchaser and its employees, officers, directors, advisors, lenders, affiliates, owners and successors and assigns shall not have any successor or vicarious liabilities. *See* Sale Order, ¶¶ R and 7.

   j. **Record Transfer and Access**. The Agreement provides for the transfer to the Purchaser of all Files and Records. *See* Agreement § 2.1.

18. The Debtor believes that the sale of the Purchased Assets to the Purchaser or other successful bidder is in the best interests of the Debtor's estate and its creditors. The Debtor further believes that obtaining the stalking horse bid, marketing the Purchased Assets with the assistance of W.G. Nielsen, and holding the Auction on the date specified by the Court will result in the highest or otherwise best consideration for the Purchased Assets.

19. The Debtor has examined the alternatives to a sale of the Purchased Assets and has determined that, in light of the Debtor's financial situation, and value of the Purchased Assets, a more viable alternative to sale of the Purchased Assets does not exist. The Debtor determined that the sale of the Purchased Assets optimizes value for its estate and creditors.

20. For the reasons stated above, and in light of the obvious benefits to the estate, the Debtor has determined, in the exercise of its business judgment, to consummate the proposal submitted under the Agreement with the Purchaser or, if applicable, another bidder in the event that the Debtor receives a higher or otherwise better bid to the transaction set forth in the Agreement.

## Relief Requested

21. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

22. A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g.*, *In re Allen,* 607 Fed.Appx. 840, No. 14-1242 (10th Cir. May 27, 2015) (citing *In re Caste, Inc*., 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *In re Martin*, 91 F.3d 389, 395 (3rd Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc*., 788 F.2d 143 (3rd Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386,

390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2nd Cir. 1983).

23. The Debtor has proposed the sale of the Purchased Assets after thorough consideration of all viable alternatives and has concluded that the sale is supported by many sound business reasons. The Debtor has extensively marketed the Purchased Assets as described above and has proposed Bid Procedures designed to maximize the purchase price realized from the sale of the Purchased Assets. Further, the Debtor believes the prepetition and postpetition marketing of the Debtor up to the proposed deadline to submit competing bids for the Purchased Assets will provide a sufficient opportunity to generate any potential overbids and maximize recovery for the Debtor's creditors. Specifically, other potential buyers and parties that have expressed interest in the acquisition of the Purchased Assets will be served with this Sale Motion and/or notice thereof.

24. Based on the foregoing, the sale of the Purchased Assets is supported by sound business reasons and is in the best interests of the Debtor and its estate. Accordingly, the Debtor requests approval under section 363(b) of the Bankruptcy Code of the Sale to the Purchaser or other successful bidder, as set forth herein.

### The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests

25. 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such Property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

26. Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of all of the applicable liens, claims and encumbrances, except with respect to any liens, claims and encumbrances permitted under the Agreement. *See Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). PMC has consented to the sale free and clear of its liens so long as the PMC Cash Amount paid to PMC in full, in cash, at the Closing. The Debtor

submits that each other lien, claim, and encumbrance that is not an assumed liability satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such lien, claim, or encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the sale proceeds, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor accordingly requests authority to convey the Purchased Assets to the Purchaser or other successful bidder(s), free and clear of all liens, claims, and encumbrances except for the liens, claims, and encumbrances that expressly permitted under the terms of the Agreement, with such liens, claims, and encumbrances to attach to the sale proceeds, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the Sale Order.

27. Accordingly, this Court should approve the sale of the Purchased Assets to the Purchaser or other successful bidder free and clear of liens, claims, and encumbrances under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

28. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

> 11 U.S.C. § 363(m).

29. Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale. *See* 11 U.S.C. § 363(n). Although the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3rd Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

> 788 F.2d at 147 (citations omitted).

30. The Agreement was negotiated at arms' length and the Purchaser has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards.

Neither the Debtor nor the Purchaser (to the best of the Debtor's knowledge) has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the Sale or the transfer of the Purchased Assets to the Purchaser.  In addition, if a party other than the Purchaser is the successful bidder, the Debtor intends to make an appropriate showing at the Sale Hearing that the purchase agreement with the other successful bidder is a negotiated, arms' length transaction, in which the successful bidder at all times has acted in good faith under and otherwise in accordance with such standards.

31. The Debtor thus requests that the Court find that the Purchaser or the successful bidder has purchased the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

### Authorization of Assumption and Assignment of Assigned Contracts

32. As required by the Agreement, and in order to enhance the value to the Debtor's estate, the Debtor requests approval of the potential assumption and assignment of any agreement, indenture, contract, lease, deed of trust, royalty, license, option, instrument, or other written commitment that have been identified as Assigned Contracts to Purchaser or the other successful bidder upon the closing of the transactions contemplated under the Agreement.

33. Pursuant to the Agreement, the Debtor is responsible for payment of all cure amounts required to be paid to the counterparties to the Purchased Contracts assumed and assigned (each a "Counterparty" and collectively, the "Counterparties") under section 365(b)(1) of the Bankruptcy Code.

34. The Purchased Contracts are those contracts or leases that are to be assumed by the Debtor and assigned to the Purchaser or the other successful bidder as part of the sale transaction under the Agreement.  The Debtor further requests that the Sale Order provide that the Assigned Contracts will be assigned to, and remain in full force and effect for the benefit of, the Purchaser or the other successful bidder, notwithstanding any provisions in the Assigned Contracts, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

35. Pursuant to the Bid Procedures Motion, the Debtor proposes that an initial list (or lists) of Assigned Contracts be served on all counterparties to such contracts and leases no later than two (2) business days after entry of the Bid Procedures Order.

36. Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under section 365(a), a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

37. Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *Matter of Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977); *In re J.H. Land & Cattle Co., Inc.,* 8 B.R. 237, 238 (Bankr. W.D. Okla. 1981); *In re Crescent Oil Co., Inc.*, 2010 WL 2721878, 3 (Bankr. D. Kan. 2010); *see also Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3rd Cir. 1982) (stating that "the usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test"). The business judgment standard mandates that a court approve a debtor's business decision unless the decision is the product of "bad faith, whim or caprice." *Lubrizon Enters v. Richmond Metal Finishes,* 756 F.2d 1043, 1047 (4th Cir. 1980).

38. A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986). The potential assumption and assignment of the Purchased Contracts, or any of the Lease Assets, set forth in the Agreement, will be a necessary part of the deal that Debtor has struck with the Purchaser or other successful bidder and, as stated above, will benefit the estate of Debtor.

39. As set forth above, with respect to Assigned Contracts to be potentially assumed

and assigned pursuant to the Sale Hearing, the Debtor has or will send the Cure Notices to all Counterparties in connection with the Court's approval of the Bid Procedures, thereby notifying such Counterparties of the potential assumption by the Debtor and assignment to the Purchaser or the successful bidder of the Assigned Contracts at the Sale Hearing. The Cure Notices set forth the "cure" amounts owing on each of the Lease Assets, according to Debtor's books and records and, in accordance with the provisions set forth in the Bid Procedures, shall be the amounts required to be paid pursuant to section 365(b)(1) of the Bankruptcy Code (**"Cure Amounts"**). The Bid Procedures Motion proposes that objections, if any, to either the Cure Amounts or the assumption or assignment of contracts and leases that are identified as Assigned Contracts to Purchaser or adequate assurance of future performance be filed on or before the objection deadline to the proposed sale. Objections to the adequate assurance of future performance of a successful bidder (other than the Purchaser), may be raised at the Sale Hearing.

40. Counterparties to Assigned Contracts will have a sufficient opportunity to file an objection to the proposed Cure Amounts set forth in the Cure Notices. To the extent no objection is filed with regard to a particular Cure Amount, such Cure Amount shall be binding on the applicable contract or lease Counterparty. The payment of the Cure Amounts specified in the Cure Notices (or a different amount either agreed to by the Debtor, or resolved by the Court as a result of a timely-filed objection filed by a contract or lease counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the counterparties for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtor determines (with the consent of the Purchaser or successful bidder) that a particular lease or contract is not truly executory, and does not need to be cured to transfer the lease or contract to the successful bidder or Purchaser.

41. Cure Amounts disputed by any Counterparty will either be considered by the Court either at the Sale Hearing or at some later date as may be scheduled by the Court to determine contested objections regarding Cure Amounts, that have not been resolved in advance or at the Sale Hearing. With respect to payment of Cure Amounts, the Debtor shall bear and pay the entire amount of such cure costs.

42. The Purchaser or other successful bidder is responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Assigned Contracts. The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." S*ee Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). If necessary, the Purchaser or the other successful bidder shall provide evidence of its ability to provide adequate assurances to Counterparties to the Assigned Contracts at the Sale Hearing. Moreover, any successful bidder will be required to provide evidence that the bidder can provide adequate assurance of future performance with respect to Assigned Contracts at the time it submits its bid.

**Notice**

43. A copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) the twenty largest unsecured creditors of the Debtor; (c) all parties who are known by the Debtor to assert liens with respect to the Purchased Assets, if any; and (d) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure. The Debtor respectfully submits that such notice is sufficient, and requests that the Court find that no further notice of the relief requested herein is required.

44. The Debtor requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the order approving this Sale Motion become effective immediately upon its entry.

**Conclusion**

45. The Debtor's proposed sale of the Purchased Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of the Debtor, its estate and creditors, and all parties in interests. The Debtor thus requests that the Court approve the proposed Sale of the Purchased Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to the Purchaser or other successful bidder.

**WHEREFORE**, the Debtor respectfully requests that this Court grant this Sale Motion by entering the attached proposed order: (i) approving the Agreement and authorizing the sale of the Purchased Assets to the Purchaser or other successful bidder; (ii) authorizing the sale of the Purchased Assets free and clear of all liens, claims, rights, encumbrances and other interests; (iii) authorizing and directing payment of the PMC Cash Amount to PMC at the Closing; (Iv) authorizing the assumption and assignment of Lease Assets that are identified as Purchased Contracts; (v) approving the form and manner of notice of this Sale Motion, and of the proposed sale and the assumption and assignment of Lease Assets that are identified as Purchased Contracts; and, (vi) granting such other and further relief as is just and proper.

Dated: November 27, 2017.

MARKUS WILLIAMS YOUNG AND ZIMMERMANN LLC

*s/Matthew T. Faga*
James T. Markus, #25065
Matthew T. Faga, #41132
1700 Lincoln Street, Suite 4550
Denver, CO 80203
Telephone: 303-830-0800
Facsimile: 303-830-0809
Email: mfaga@markuswilliams.com

*Counsel for the Debtor and Debtor-in-Possession*