**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**NINER, INC.,**

**as SELLER,**

**and**

**NINER ACQUISITION LLC,**

**as BUYER**

**DATED AS OF**

**NOVEMBER 27, 2017**

**EXHIBIT**

**1**

# TABLE OF CONTENTS

**Page**

ARTICLE 1      DEFINITIONS ........................................................................................... 1

ARTICLE 2      PURCHASE AND SALE .......................................................................... 8

     Section 2.1      Purchase and Sale of Assets ........................................... 8
     Section 2.2      Excluded Assets .............................................................. 9
     Section 2.3      Assumed Liabilities ...................................................... 10
     Section 2.4      Excluded Liabilities ..................................................... 10
     Section 2.5      Exclusion of Assigned Contracts .................................. 11
     Section 2.6      Non-Assignable Purchased Assets ............................... 11
     Section 2.7      Purchase Price .............................................................. 12
     Section 2.8      Closing ......................................................................... 12
     Section 2.9      Transactions to Be Effected at the Closing .................. 12
     Section 2.10      Allocation of Purchase Price ........................................ 13

ARTICLE 3      REPRESENTATIONS AND WARRANTIES OF SELLER ................. 14

     Section 3.1      Organization ................................................................. 14
     Section 3.2      Due Authorization, Execution and Delivery; Enforceability ...................... 14
     Section 3.3      No Conflicts; Consents ................................................. 14
     Section 3.4      Assets ........................................................................... 14
     Section 3.5      Material Contracts ........................................................ 15
     Section 3.6      Legal Proceedings ........................................................ 16
     Section 3.7      Compliance with Laws; Permits ................................... 16
     Section 3.8      Environmental and Health and Safety Matters ............. 16
     Section 3.9      Taxes ............................................................................ 17
     Section 3.10      Intellectual Property .................................................... 17
     Section 3.11      Financial Advisors ....................................................... 18
     Section 3.12      No Other Representations and Warranties ................... 18

ARTICLE 4      REPRESENTATIONS AND WARRANTIES OF BUYER .................. 18

     Section 4.1      Organization ................................................................. 18
     Section 4.2      Due Authorization, Execution and Delivery; Enforceability ...................... 18
     Section 4.3      No Conflicts; Consents ................................................. 18
     Section 4.4      Financial Advisors ....................................................... 19
     Section 4.5      Sufficiency of Funds .................................................... 19
     Section 4.6      Solvency ....................................................................... 19
     Section 4.7      Legal Proceedings ........................................................ 19
     Section 4.8      Independent Investigation ............................................ 19

ARTICLE 5      COVENANTS .......................................................................................... 19

     Section 5.1      Conduct of Business Prior to the Closing ..................... 19
     Section 5.2      Access to Information ................................................... 20
     Section 5.3      Notice of Certain Events ............................................... 21
     Section 5.4      Confidentiality ............................................................. 21
     Section 5.5      Governmental Approvals and Other Third-Party Consents ...................... 21
     Section 5.6      Books and Records ....................................................... 22
     Section 5.7      Closing Conditions ....................................................... 22
     Section 5.8      Public Announcements ................................................. 22
     Section 5.9      Further Assurances ....................................................... 23
     Section 5.10      Transfer Taxes .............................................................. 23
     Section 5.11      Financing ...................................................................... 23
     Section 5.12      Nature of Transaction ................................................... 23
     Section 5.13      Supplements to Schedules ............................................ 24

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| Section 5.14 | Bankruptcy Matters | 24 |
| ARTICLE 6 | CONDITIONS TO CLOSING | 26 |
| Section 6.1 | Conditions to Obligations of All Parties | 26 |
| Section 6.2 | Conditions to Obligations of Buyer | 26 |
| Section 6.3 | Conditions to Obligations of Seller | 27 |
| ARTICLE 7 | TERMINATION | 28 |
| Section 7.1 | Termination by the Parties | 28 |
| Section 7.2 | Effect of Termination | 29 |
| ARTICLE 8 | MISCELLANEOUS | 30 |
| Section 8.1 | Survival | 30 |
| Section 8.2 | Expenses | 30 |
| Section 8.3 | Notices | 30 |
| Section 8.4 | Interpretation | 31 |
| Section 8.5 | Headings | 31 |
| Section 8.6 | Severability | 31 |
| Section 8.7 | Entire Agreement | 31 |
| Section 8.8 | Successors and Assigns | 31 |
| Section 8.9 | No Third-Party Beneficiaries | 31 |
| Section 8.10 | Amendment and Modification; Waiver | 31 |
| Section 8.11 | Governing Law; Submission to Jurisdiction; Venue | 32 |
| Section 8.12 | Specific Performance | 32 |
| Section 8.13 | Limitation on Damages | 32 |
| Section 8.14 | Disclosure Schedules | 32 |
| Section 8.15 | Counterparts | 32 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of November 27, 2017, is entered into by and among Niner, Inc., a Colorado corporation ("Seller"), and Niner Acquisition LLC, a Delaware limited liability company ("Buyer").

### RECITALS

A.      On November 27, 2017 (the "Petition Date"), Seller filed a voluntary petition for relief commencing the bankruptcy case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court").

B.      Seller operates, among other things, the Business, as defined below.

C.      Upon the terms and subject to the conditions contained in this Agreement, and as authorized under sections 363 and 365 of the Bankruptcy Code, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, all of the right, title, and interest of Seller in the Purchased Assets (as defined below), including Seller's interests in the Business, and to assume from Seller the Assumed Liabilities, for operation of the Business.

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE 1:

"ABL" means the Loan and Security Agreement entered into between PMC Financial Services Group, LLC and Seller on or about April 23, 2012, and including the Schedule thereto, and all agreements referenced and incorporated therein, as amended, modified or restated as of the Petition Date, and encompassing the prepetition and post-petition obligations of Seller to PMC.

"Accrued Expenses" means Seller's unpaid expenses as of Closing for ordinary course operational expenses accruing from the first day of the month of Closing to the date of Closing, and in each case no more than 30 days past due, for Seller's employee obligations, information technology expenses, gas, water, electricity, or other utilities, in amounts not to exceed the amounts set forth for such expenses in the DIP Budget.

"Additional Cash Amount" has the meaning set forth in Section 2.7(a).

"Assets" means all property of Seller, whether real, personal, tangible, or intangible, and including all interests, titles, claims, demands, or rights.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 2.10.

"Assigned Contracts" means the Contracts in which Seller has an interest relating to the Business set forth in Schedule 2.1(c).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"Bid Procedures Order" means the Order or Orders of the Bankruptcy Court to be entered pursuant to sections 363, and 365 of the Bankruptcy Code:

> (i) establishing procedures and a timeline for the conduct of a competitive sale process and the solicitation of bids for the sale of substantially all of the Debtor's assets or any portion thereof,

> (ii) authorizing, but not directing, the Debtor, in consultation with its retained professionals and advisors, to conduct a sale of substantially all of its assets or any portion thereof in accordance with such approved procedures,

> (iii) authorizing, but not directing, the Debtor to designate a stalking horse if the Debtor determines that it would benefit the sale and bidding process to do so and to grant such stalking horse the stalking horse protections or any portion thereof, in each case in the sole discretion of the Debtor and without further application to or Order of the Bankruptcy Court, but subject to the filing of a Notice of Designation of Stalking Horse,

> (iv) scheduling an auction for the sale of any assets for which one or more qualified bid is received in accordance with the approved bidding procedures,

> (v) establishing procedures for the conduct of such auction, and

> (vi) scheduling a Sale Hearing.

"Break-Up Fee" has the meaning set forth in Section 5.12(d)(i).

"Books and Records" means Documents, books, and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, suppliers lists, production data, quality control records and procedures, assay reports, environmental studies, reports and analyses, plans, sales records, tax records, strategic plans, material and research, including all technical records, files, papers, surveys and plans or specifications.

"Business" means the manufacture, distribution, and sale of bicycles, parts, and components thereof conducted by Seller.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in Denver, Colorado are closed for business.

"Buyer" has the meaning set forth in the Preamble.

"Chapter 11 Case" has the meaning set forth in the recitals.

"Claims" means all rights or causes of action (whether in law or equity), legal proceedings, obligations, demands, restrictions, warranties, guaranties, indemnities, consent rights, options,

contract rights, rights of recovery, setoff, recoupment, indemnity or contribution, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise, including all "claims" as defined in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 2.8.

"Closing Date" has the meaning set forth in Section 2.8.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Non-Disclosure Agreement by and between Niner, Inc. and Columbia Basin Partners, LLC dated March 7, 2017.

"Contract" means any agreement, indenture, contract, lease, deed of trust, royalty, license, option, instrument, or other written commitment.

"Credit Limit" has the meaning set forth in the ABL.

"Cure Amounts" means the amounts which must be paid or otherwise satisfied by Buyer, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Assigned Contracts to Buyer as provided herein as those amounts are allowed by the Bankruptcy Court, unless such amounts are otherwise agreed upon by Buyer and the counterparty to the applicable Assigned Contract, including the Cure Amounts set forth on Schedule 3.5(b) (as may be supplemented or modified in accordance with this Agreement).

"Cut-Off Date" has the meaning set forth in Section 2.5.

"Debtor" means the Seller in its capacity as debtor in possession in the Chapter 11 Case.

"DIP Budget" has the meaning set forth in Section 2.6.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement and all references in this Agreement to a particular Schedule are references to Schedules in the Disclosure Schedules and not schedules to this Agreement.

"Documents" means all paper related to the Business in possession of Seller, all electronic data related to the Business stored on Seller's computers, databases, or electronic files, or hosted by third party vendors on behalf of Seller.

"Dollars" and "$" means the lawful currency of the United States.

"Drop Dead Date" has the meaning set forth in Section 7.1(b)(i).

"Eligible Inventory" has the meaning set forth in the ABL.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in ERISA Section 3(3), whether or not ERISA applies), and any profit-sharing, bonus, incentive, stock option, stock purchase, stock ownership, pension, retirement, severance, termination, deferred compensation, excess benefit, supplemental unemployment, post-retirement medical or life insurance, welfare, incentive, sick leave, long-term disability, medical, hospitalization, life insurance, other insurance or employee benefit plan, whether formal or informal, oral or written, that, in each case, is sponsored, maintained or contributed to, or required to be contributed to, by Seller or any ERISA

Affiliate or under which Seller has or any ERISA Affiliate has, or may have, any present or future liability.

"Encumbrance" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"Environmental Claim" means any action, suit, claim, investigation or other legal proceeding alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence, Release of, or exposure to, any Hazardous Materials, or (ii) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, Governmental Order or binding agreement with any Governmental Authority: (i) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata), or (ii) concerning the Release or presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"Environmental Notice" means any written directive, notice of violation or infraction, or notice or written communication from a Governmental Authority relating to actual or potential material liability arising under or material non-compliance with any Environmental Law or any material term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means each entity that is treated as a single employer with Seller for purposes of Code section 414.

"Escrow Agreement" means an escrow agreement between Escrow Holder, Buyer and Seller consistent with the terms of this Agreement, in form reasonably satisfactory to such parties, regarding the Escrow Deposit.

"Escrow Deposit" shall have the meaning provided for under Section 2.7(c)(i).

"Escrow Holder" means Markus Williams Young & Zimmermann LLC.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means any Contract that is not an Assigned Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authorities have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority, and does not mean or include any Permit.

"Hazardous Materials" means: (i) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws, and (ii) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Health and Safety Claim" means any action, suit, claim, investigation or other legal proceeding alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, governmental response, personal injuries, medical monitoring, penalties, indemnification and injunctive relief) arising out of, based on or resulting from: (i) the presence of, or exposure to, any workplace hazard, or (ii) any actual or alleged non-compliance with any Health and Safety Law or applicable implementing plan, agreement, or order.

"Health and Safety Law" means any applicable Law, Governmental Order or binding agreement with any Governmental Authority: (i) relating to workplace human health or safety, or (ii) human exposures, including the Federal Mine Safety and Health Act of 1977, as amended, the Occupational Safety and Health Act of 1970, as amended, implementing regulations, and similar state laws.

"Health and Safety Notice" means any written directive, notice of violation or infraction, or notice or written communication from a Governmental Authority relating to actual or potential liability arising under or non-compliance with any Health and Safety Law.

"Intellectual Property" means any and all of the following in any jurisdiction: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (iii) trade secrets and confidential know-how; (iv) patents and patent applications; (v) websites and internet domain name registrations; (vi) all frame molds, models, specifications, drawings, renderings, schematics, design and production details; (vii) all rights in intellectual property related to the Business held by third parties, including frame manufacturers; and (viii) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"Intellectual Property Contracts" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party.

"Knowledge" of Seller means the actual knowledge of Chris Sugai, after making reasonable inquiry of other relevant officers and employees of Seller, but without the requirement to make any inquiries of third parties or Governmental Authorities or to perform any search of any public records.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Real Property" means real property leased by Seller and held for use in connection with the Business.

"Loss" or "Losses" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is materially adverse to the Business, results of operations, financial condition, or assets of the Business taken as a whole, including refusal of Seller's suppliers to ship to Buyer under similar trade terms as provided to Seller in the six months prior to the Petition Date. "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer. "Material Adverse Effect" shall also include:

a. the failure of Buyer to obtain a commitment for financing on terms acceptable to Buyer no later than two business days prior to Closing;

b. PMC altering, modifying, or amending the terms of the ABL unless agreed to by each of PMC, Buyer and Seller;

c. Seller defaulting under the ABL or breaching any term of the ABL, regardless of PMC's waiver of any such default or breach;

d. Seller borrowing or procuring any additional debt or equity financing from PMC, or any other provider of capital, that, in aggregate, whether the funding originated from PMC or elsewhere, would cause Seller to exceed the Credit Limit plus the Overadvance;

e. Seller's failure to comply with limits on expenditures under the DIP Budget;

f. If the sum of Seller's cash less all Accrued Expenses is $50,000 or less at the time of Closing;

g. Seller's actual Eligible Inventory prior to Closing is ten percent or more less than the amount set forth on Schedule 2.1(f);

h. Seller's Eligible Inventory at Closing is less than $4.0 million;

i. Seller's total revenue, accounted for in a manner consistent with Seller's current accounting practices, for the period of October 1, 2017 through December 31, 2017 is 7.0% or more less than the total revenue generated by Seller between October 1, 2016 and December 31, 2016;

j. In accordance with generally accepted accounting principles and in a manner consistent with Seller's traditional revenue recognition practices, Seller's total revenue for the twelve months ending December 31, 2017 is less than $12,545,961 [i.e., 90% of the 2016 total revenue];

k. PMC Obligations at the time of Closing exceed $3,750,000;

l. The PMC Obligations less the Principal Amount Outstanding on the ABL and accrued non-default interest exceeds $80,000;

m. The departure of key personnel from Seller prior to Closing.

"Material Contracts" means each Assigned Contract to which Seller or any of its Affiliates is a signatory that relates to the Business or the Purchased Assets (i) which, if terminated or modified or

if it ceased to be in effect, would result in a Material Adverse Effect, (ii) that has annual payment obligations that are in excess of $100,000 and which may not be cancelled on thirty (30) days' prior notice or less, (iii) that relates to indebtedness for borrowed money, whether incurred, assumed, guaranteed or secured by any asset, with an outstanding principal amount in excess of $100,000, (iv) that relates to the acquisition of any business (whether by merger, sale of stock, sale of assets or otherwise), for consideration in excess of $100,000, (v) that materially limits or restricts the operator of the Business from engaging in any line of business, in any geographic area or with any other person, (vi) that materially impacts the supply of raw materials, inputs, componentry or production process, or (vii) that provides for the assumption of any material liability of any other Person by Seller.

"Material Permits" has the meaning set forth in Section 3.7(b).

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Overadvance" means $215,000.

"Permits" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities and held for use in connection with the Business.

"Permitted Encumbrances" means: (i) Encumbrances for Taxes not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, (ii) mechanics', carriers', workers', repairers' and similar Encumbrances arising or incurred in the ordinary course of business, (iii) environmental or health and safety regulations by any Governmental Authority, (iv) terms and conditions of, and Encumbrances created by, any Assigned Contract that has been disclosed in the Disclosure Schedules, (v) Encumbrances that arise solely by reason of acts of, or with the written approval of, Buyer, (vi) Encumbrances not created by Seller that affect the underlying interest of any Leased Real Property, (vii) any set of facts an accurate up-to-date survey would show, and (viii) any other Encumbrance that would not be materially adverse to the conduct of the Business.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Petition Date" has the meaning set forth in the recitals.

"PMC" means PMC Financial Services Group, LLC.

"PMC Obligations" means the "Obligations," as that term is defined in the ABL.

"Principal Amount Outstanding" means the outstanding unpaid amount loaned by PMC to Seller for use in Seller's operations, but shall not include any interest, fees, or other charges.

"Purchase Price" has the meaning set forth in Section 2.7(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"Sale Order" means an Order or Orders of the Bankruptcy Court issued pursuant to sections 363, and 365 of the Bankruptcy Code, authorizing and approving, among other things, (a) the sale, transfer and assignment of the Purchased Assets to Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Encumbrances (except for Permitted Encumbrances), (b) the assumption and assignment of the Assigned Contracts in connection therewith and (c) that Buyer is a "good faith" purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

"Seller" has the meaning set forth in the Preamble.

"Tangible Property" means all tangible personal property listed on Schedule 2.1(a) and, to the extent not included therein, any tangible personal property included in the Purchased Assets.

"Tax" or "Taxes" means (i) all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, health and safety, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, unclaimed property and escheat obligations, or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, and (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of the operation of Law or any express or implied obligation to indemnify any other Person.

"Tax Return" means any return, document, declaration, report, election, estimated tax filing, claim for refund, declaration of estimated Tax, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transfer Taxes" has the meaning set forth in Section 5.9.

"Transition Permit" has the meaning set forth in Section 5.4(b).

"Water Rights" means water rights owned or leased by Seller or its Affiliates and held for use in connection with the Business.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Assets. Subject to the terms and conditions set forth in this Agreement and in the Sale Order, at the Closing, Seller shall irrevocably sell, assign and transfer to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances other than Permitted Encumbrances, all of Seller's right, title, and interest in, to and under the following Assets and Tangible Property (the "Purchased Assets"):

(a)    the Assets and Tangible Property described in Schedule 2.1(a);

(b)    the Leased Real Property described in Schedule 2.1(b);

(c)    the Assigned Contracts described in Schedule 2.1(c);

(d)    the Permits described in Schedule 2.1(d) under the heading "Transferred Permits";

(e)    the Intellectual Property set forth on Schedule 2.1(e);

(f)    the Eligible Inventory set forth in Schedule 2.1(f);

(g)    originals, or where not available, copies, of all Books and Records relating to the Business other than those set forth in Section 2.2;

(h)    all of the rights of Seller under warranties, indemnities, and all similar rights against third parties the extent related to the Business to the extent assignable;

(i)    deposits, prepaids, retainers and similar amounts paid to vendors in connection with the Business relating to or arising in connection with any of the Assigned Contracts; and

(j)    all Claims to the extent related to the Purchased Assets described in this Section 2.1 or the Assumed Liabilities, but specifically excluding all Claims arising under chapter 5 of the Bankruptcy Code (i) against counterparties who are party to (or Affiliates of a party to) any Assigned Contract, (ii) otherwise arising under or related to the Purchased Assets, or (iii) against Buyer (or Buyer's Affiliates); provided, that the Debtor shall retain the right to assert any such Claims as a defense or objection to proofs of claim asserted against the Debtor or its bankruptcy estate in the Chapter 11 Case.

Section 2.2    Excluded Assets. Other than the Purchased Assets, Buyer expressly acknowledges and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets"). For greater certainty, Excluded Assets include the following assets and properties of Seller:

(a)    the Excluded Contracts;

(b)    the organizational documents, minute books, stock books, stock certificates, stock ledgers, corporate seal, Tax Returns, books of account or other records having to do with the corporate ownership, organization of Seller, qualification to do business, or existence of Seller, all employee-related or employee benefit-related files or records, and any other Books and Records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(c)    any Claims of Seller's estate under chapter 5 of the Bankruptcy Code or analogous state statutes including Claims under section 547, 548, 549 or 550 of the Bankruptcy Code;

(d)    all Employee Benefit Plans and all assets and Contracts associated with the Employee Benefit Plans;

(e)    the rights which accrue or will accrue to Seller under this Agreement and the documents and instruments delivered in connection herewith and all cash and non-cash consideration payable and deliverable to Seller under this Agreement or any such documents or instruments;

(f)    any depository, checking or other account maintained by Seller at any bank or financial institution;

(g)      all rights and Claims arising out of, relating to or reasonably necessary to enforce or enjoy the benefits of any Contract that is not an Assigned Contract or any other Excluded Asset, including any security or other deposit, refund, rebate, credit or payment due Seller thereunder;

(h)      all pending litigation or proceedings and all rights, claims, counterclaims, offsets and causes of action asserted or which could be asserted, including, without limitation, as a defense to any of the proofs of claim filed in the Chapter 11 Case;

(i)      all equipment and property of any contractor or third party located on any of the Purchased Assets and not owned by Seller;

(j)      all insurance policies of Seller to the extent related to the Business; and

(k)      the Assets, properties, and rights set forth in Schedule 2.2(k) and

(l)      cash in an amount equal to the Accrued Expenses (the "Retained Cash").

Section 2.3      Assumed Liabilities. Subject to the terms and conditions set forth herein, Buyer shall assume, pay, satisfy, perform and discharge when due only the following liabilities and obligations of Seller with respect to the Purchased Assets and the Business (collectively, the "Assumed Liabilities"):

(a)      all liabilities and obligations relating to the ownership or operation of the Purchased Assets accruing after the Closing Date;

(b)      all liabilities and obligations under any of the Assigned Contracts arising after the Closing Date;

(c)      all Cure Amounts;

(d)      all liabilities and obligations for Taxes:  (i) relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof after the Closing Date; and

(e)      all liabilities and obligations listed in Schedule 2.3.

Section 2.4      Excluded Liabilities. Other than the Assumed Liabilities and Permitted Encumbrances, Buyer shall not assume and shall not be responsible to pay, satisfy, perform or discharge any liabilities or obligations of Seller with respect to the Purchased Assets or the Business, whether known, unknown, direct, indirect, absolute, contingent or otherwise, or arising out of facts, circumstances or events in existence on or prior to Closing including the following (collectively, the "Excluded Liabilities"):

(a)      any liabilities or obligations relating to or arising out of the Excluded Assets;

(b)      all warranty claims for goods sold by Seller prior to Closing;

(c)      all liabilities and obligations resulting from any (i) fine, (ii) penalty, (iii) claim for damages, (iv) health and safety violation, (v) regulatory order or (vi) breach of Law or Contract, in each case, due to Seller's acts or omissions prior to Closing as the operator or manager of the Business;

(d)      any liabilities or obligations for Taxes: (i) relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period or portion thereof ending on or prior to the Closing Date; and (ii) Taxes of Seller or an Affiliate of Seller not related to the Business;

(e)     any liabilities or obligations relating to or arising out of Seller's obligations to its professionals, attorneys, investment bankers, financial advisors, accountants, or any other agent of Seller;

(f)     any liabilities or obligations relating to (i) any employees, or employment Contracts, of Seller or (ii) any Employee Benefit Plans;

(g)     all accrued but unpaid liabilities of the Seller existing as of Closing, including all Accrued Expenses; and

(h)     any liabilities and obligations of Seller set forth in Schedule 2.4.

Section 2.5     Exclusion of Assigned Contracts. From the date hereof until two Business Days prior to the Sale Hearing (the "Cut-Off Date"), Buyer shall have the right, upon written notice to Seller, to exclude any Contract from the Assigned Contracts, or supplement the list of Assigned Contracts to include any Contract that should have been listed on Schedule 2.1(c) (in each case, subject to the requirements of sections 365(a) and 365(f) of the Bankruptcy Code), for any reason. Any Contract so excluded by Buyer shall be deemed to no longer be an Assigned Contract and shall be deemed an Excluded Asset. Any Schedules hereto shall be amended to reflect any changes made pursuant to this Section 2.5 and Buyer shall have no obligation to pay the Cure Amount (if any) associated with any Contract that is excluded from the Assigned Contracts pursuant to this Section 2.5.

Section 2.6     DIP Budget.  The DIP Budget shall be the budget of expenditures set forth on Schedule 2.6.

Section 2.7     Purchase Price.

(a)     The aggregate consideration for the Purchased Assets (the "Purchase Price") shall consist of:

(i)     Cash in an amount equal to the PMC Obligations as of the Closing Date which amount shall account for all funds collected and retained in the lockbox held by PMC excluding the Retained Cash (the "PMC Cash Amount");

(ii)     Plus additional cash in the amount of $100,000 (the "Additional Cash Amount");

(iii)     Plus the assumption of the Assumed Liabilities.

(b)     No later than three Business Days prior to Closing, Seller shall deliver to Buyer a statement indicating wire transfer instructions for Seller.  By 10:00 a.m., Denver, Colorado time on the Closing Date, Buyer shall deliver to Seller by wire transfer an amount equal to the Additional Cash Amount in accordance with such instructions in cash.

(c)     Escrow Deposit.

(i)     Within two Business Days after the entry of the Bid Procedures Order, Seller and Buyer shall enter into the Escrow Agreement and Buyer shall deposit $300,000 with the Escrow Holder, as an earnest money deposit (as deposited, together with interest accrued thereon, the "Escrow Deposit").  The Escrow Deposit will be held in trust without interest and shall be disbursed only upon joint direction of Buyer and Seller or upon court order.  The Escrow Deposit shall be held by Escrow Holder in a segregated escrow account in accordance with the terms and conditions of the Escrow Agreement and this Agreement.  Seller and Buyer shall bear equally the fees and costs of the Escrow Holder.

(ii)     At Closing, the Escrow Deposit shall be credited and applied toward the Purchase Price and the PMC Cash Amount.

(iii)     If this Agreement terminates without a Closing, the Escrow Holder shall immediately disburse the Escrow Deposit as follows:

(1)     to Seller if this Agreement is terminated pursuant to Section 7.1(c)(ii) or (iii); and

(2)     to Buyer if this Agreement is terminated pursuant to Section 6.1, Section 7.1(a), Section 7.1(b), Section 7.1(c)(iv), Section 7.1(c)(v), or Section 7.1(d).

Section 2.8     Closing.     Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated herein, including the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing"), shall take place electronically via email beginning at 9:00 a.m., Denver, Colorado time, on the first day on which the conditions to Closing set forth in ARTICLE 6 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date) or at such other time or on such other date or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "Closing Date").

Section 2.9     Transactions to Be Effected at and Following the Closing.

(a)     At the Closing, Seller shall deliver to Buyer the following, substantially in the applicable form attached hereto as Exhibit B with respect to the items listed in Section 2.9(a)(ii) through Section 2.9(a)(v) below:

(i)     a true and correct copy of the Sale Order;

(ii)     a duly executed bill of sale pursuant to which Seller's right, title, and interest in, to, and under all of the Purchased Assets not otherwise assigned at Closing shall be assigned to Buyer;

(iii)     duly executed assignments, pursuant to which Seller's right, title, and interest in, to and under all of the Purchased Assets that are Leased Real Property not otherwise assigned at Closing shall be assigned to Buyer;

(iv)     duly executed assignments and bills of sale, pursuant to which Seller's right, title, and interest in, to and under the Purchased Assets that are Tangible Property not otherwise assigned at Closing shall be assigned to Buyer;

(v)     duly executed assignments, pursuant to which all of the Purchased Assets that are Assigned Contracts or Permits, in each case, that may be transferred at Closing in accordance with applicable Law, not otherwise assigned at Closing shall be assigned to Buyer; and

(vi)     all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing pursuant to Section 6.2.

(b)     At the Closing, Buyer shall deliver to, or on behalf of (in the case of Section 2.9(b)(v)), Seller the following:

(i)     The PMC Cash Amount, less the Escrow Deposit, directly to PMC by wire transfer in accordance with wire instructions provided by PMC to Buyer;

(ii)     the Cure Amounts required to be paid by Buyer in accordance with the terms hereof to the counterparties of the applicable Assigned Contracts;

(iii)     the Additional Cash Amount, in cash, pursuant to Section 2.7;

(iv)     written instructions to the Escrow Holder, signed by Buyer, instructing the Escrow Holder to release to PMC, by wire transfer of immediately available funds into an account or accounts designated by PMC, the Escrow Deposit, which Escrow Deposit shall be applied by Seller and PMC as a credit against the Purchase Price and PMC Cash Amount;

(v)     duly executed assumption agreements substantially in the form attached as Exhibit C hereto, pursuant to which the Assumed Liabilities not otherwise assigned at Closing shall be assigned to Buyer;

(vi)     all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to Section 6.3.

Section 2.10     Allocation of Purchase Price.   Within thirty days after the Closing Date, Buyer shall deliver to Seller a schedule allocating the Purchase Price among the assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provision of state or local Tax law) or any successor provision (the "Allocation Schedule").   The Allocation Schedule shall be subject to the approval of Seller, which approval shall not be unreasonably withheld or delayed.   The Allocation Schedule shall be reasonable and shall be prepared, and subsequently adjusted, in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder.   The Allocation Schedule shall be deemed final unless Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule within thirty (30) days after delivery of the Allocation Schedule to Seller.   In the event of any such objection, Buyer and Seller will work expeditiously and in good faith in an attempt to resolve such dispute within a further period of fifteen (15) days after the date of notification by Seller to Buyer of such dispute, failing which the dispute shall be submitted for determination to an independent national firm of certified public accountants mutually agreed to by Seller and Buyer (and, failing agreement between Seller and Buyer on the firm of certified public accountants within a further period of five (5) Business Days, such independent national firm of certified public accountants shall be Ernst & Young LLP).   The determination of the firm of certified public accountants shall be final and binding upon the parties hereto and shall not be subject to appeal.   The firm of certified public accountants shall be deemed to be acting as experts and not as arbitrators.   The fees and expenses of such accounting firm shall be borne equally by Seller, on the one hand, and Buyer, on the other.   Seller and Buyer shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Allocation Schedule (as it may be subsequently adjusted) and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings).   Seller and Buyer shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. Not later than thirty (30) days prior to the filing of their respective Forms 8594 (and analogous state law forms) relating to the Closing, Seller and Buyer shall deliver to the other a copy of its Form 8594 (and such analogous state law forms).   Seller and Buyer agree to notify and provide the other party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes or any other filing with a Governmental Authority regarding the Allocation Schedule.   Notwithstanding the preceding sentence, Seller and Buyer may settle any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the allocation of the Purchase Price and other applicable items among the Purchased Assets, and neither Buyer nor Seller shall be required to litigate before any Governmental Authority any proposed deficiency or adjustment by any Governmental Authority challenging any final Allocation Schedule.   Notwithstanding anything in this Agreement to the contrary, this Section 2.10 shall survive the Closing without limitation.   Seller and Buyer acknowledge and agree that this

Section 2.10 pertains to the allocation of the Purchase Price for Tax purposes, but not for any other purpose.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer as follows:

Section 3.1    Organization.  Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Colorado.  Seller is duly qualified to do business as a foreign corporation, and is in good standing under the Laws of, each state in which failure to be so qualified would be materially adverse to the conduct of the Business.

Section 3.2    Due Authorization, Execution and Delivery; Enforceability.  Subject to the entry of the Sale Order by the Bankruptcy Court, Seller has the corporate power and authority to enter into this Agreement and the other agreements contemplated hereby, and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  Subject to the entry of the Sale Order by the Bankruptcy Court, the execution and delivery by Seller of this Agreement, the performance by Seller of its obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite corporate action.  This Agreement has been duly executed and delivered by Seller and, subject to the entry of the Sale Order by the Bankruptcy Court, constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 3.3    No Conflicts; Consents.  Except as set forth in Schedule 3.3, subject to the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not:  (a) result in a violation or breach of any provision of Seller's articles of incorporation or bylaws, (b) result in a violation or breach of any material Governmental Order applicable to Seller, or (c) require the consent of any Person under, conflict with, result in a material violation or breach of, constitute a material default or an event that, with or without notice or lapse of time or both, would constitute a material default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel, any Assigned Contract.  No consent, approval, Permit, Governmental Order (other than in connection with the Chapter 11 Case), declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Seller in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, except (x) as set forth in Schedule 3.3, (y) entry of the Sale Order by the Bankruptcy Court, and (z) such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not be materially adverse to the conduct of the Business.

Section 3.4    Assets.

(a)    The following Schedules in this Section 3.4(a) are a true and complete list of the respective items indicated below, except where the failure to be a true and complete list would not result in a Material Adverse Effect:

(i)    Schedule 2.1(a) sets forth the Assets and Tangible Property held or used in connection with the Business.

    (ii)    Schedule 2.1(b) sets forth the Leased Real Property held or used in connection with the Business.

    (iii)    Schedule 2.1(c) sets forth the Assigned Contracts held or used in connection with the Business.

    (iv)    Schedule 2.1(d) sets forth the Permits held or used in connection with the Business.

    (v)    Schedule 2.1(e) sets forth the Intellectual Property held or used in connection with the Business.

    (vi)    Schedule 2.1(f) sets forth the Eligible Inventory held or used in connection with the Business as of the date of the execution of this Agreement.

    (b)    Seller owns an undivided interest in and to the Assets.

    (c)    Seller has a valid and enforceable leasehold or subleasehold interest in the Leased Real Property set forth in Schedule 2.1(b).

    (d)    The Purchased Assets constitute all of the material Assets and Tangible Property used in the Business (i) as it is currently conducted other than the Excluded Assets and (ii) that are necessary to conduct the Business in all material respects as it is currently conducted.

    (e)    Seller has, and subject to the Sale Order shall convey to Buyer at the Closing, good and marketable title to all of the Purchased Assets, in each case free and clear of all Encumbrances (other than Permitted Encumbrances).

Section 3.5    Contracts.

    (a)    Schedule 3.5(a) lists all of the material Contracts of Seller necessary to conduct the Business in all material respects as it is currently conducted.

    (b)    Schedule 3.5(b) sets forth Seller's estimate, based on reasonable inquiry, as of the date hereof, of the Cure Amounts associated with each Assigned Contract.

Section 3.6    Legal Proceedings.    There are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to Seller's Knowledge threatened, against Seller relating to the Business, which would be materially adverse to the conduct of the Business.

Section 3.7    Compliance with Laws; Permits.

    (a)    Buyer has not been given notice or been charged with any material violation of any Law of any Governmental Authority. To Seller's Knowledge, Seller is not in material violation of any Law. No material investigation or review by any Governmental Authority is pending or, to Seller's Knowledge, threatened, against Seller or any of its assets and properties, nor has any Governmental Authority indicated to Seller an intention to conduct the same. Seller has complied in all material respects with all applicable Laws in the operation of the Business and ownership and use of the Purchased Assets.

    (b)    Schedule 3.7(b) sets forth the material Permits necessary for the operation of the Business as presently being conducted (the "Material Permits"). Except as set forth on Schedule 3.7(b), the Material Permits have been duly obtained and Seller is not in material default or material breach of any such Material Permit.

(c)     None of the representations and warranties contained in this Section 3.7 shall relate to or be deemed to relate to environmental matters or health and safety (which are governed exclusively by Section 3.8), tax matters (which are governed exclusively by Section 3.9) or intellectual property matters (which are governed exclusively by Section 3.10).

Section 3.8     Environmental and Health and Safety Matters.

(a)     To Seller's Knowledge, (i) Seller is in material compliance with all Environmental Laws and Health and Safety Laws, except where the failure to be in such compliance would not be expected to be materially adverse to the conduct of the Business, and Seller has not received any Environmental Notice, Environmental Claim, Health and Safety Notice or Health and Safety Claim relating to the Business or the Purchased Assets, which either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)     Schedule 3.8(b) sets forth each of the material Environmental Permits necessary for the operation of the Business, each of which is in full force and effect. Seller has obtained and is in material compliance with all Environmental Permits listed in Schedule 3.8(b).

(c)     To Seller's Knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Laws or that would be materially adverse to the conduct of the Business.

(d)     Seller has not entered into, and to Seller's Knowledge, the Purchased Assets are not otherwise subject to (i) any consent decree, order, judgment or judicial order relating to compliance with Environmental Laws or Environmental Permits or the investigation, sampling, monitoring, treatment, remediation, removal or cleanup of Hazardous Materials, and no litigation is pending with respect thereto, or (ii) any environmental indemnification in connection with any threatened or asserted claim by any third party for any liability under any Environmental Law or relating to any Hazardous Materials.

(e)     Seller has not entered into, and to Seller's Knowledge, the Purchased Assets are not otherwise subject to (i) any consent decree, administrative order, judgment or judicial order relating to compliance with Health and Safety Laws, or (ii) any indemnification in connection with any threatened or asserted claim by any third party for any liability under any Health and Safety Law.

Section 3.9     Taxes.

(a)     Except as set forth in Schedule 3.9(a), (i) all Taxes due and owing by Seller with respect to the Purchased Assets have been duly and timely paid in full, (ii) no Tax deficiencies are being proposed in writing or have been assessed by any Governmental Authority with respect to the Purchased Assets that remain outstanding or unsatisfied, (iii) there are no Tax liens on any of the Purchased Assets for which Seller would be responsible, other than liens for Taxes not yet due and payable, (iv) no federal, state, local or foreign audits or administrative or judicial proceedings are presently pending, or threatened in writing, with regard to any Taxes or Tax Returns with respect to the Purchased Assets

(b)     The representations and warranties set forth in this Section 3.9 are the exclusive representations and warranties made by Seller with respect to Taxes.

Section 3.10     Intellectual Property.

(a)     Schedule 3.10(a) sets forth an accurate and complete list of (i) all trademarks, tradenames, and patents (A) owned by Seller, (B) licensed by Seller, (C) used by Seller in the Business, or (D) registered or pending applications for registration of any trademarks, tradenames, or patents described in clause (A) in any jurisdiction, (ii) all domain names of Seller, (iii) websites and

internet domain name registrations; (iv) all frame molds, models, specifications, drawings, renderings, schematics, design and production details; (v) all of Seller's rights in intellectual property related to the Business held by third parties, including frame manufacturers; and (vi) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.. Except as set forth in Schedule 3.10(a), Seller does not own, license or use any registered copyrights in connection with the Business.

(b)     Except as would not be materially adverse to the conduct of the Business, (i) Seller owns or has the right to use all Intellectual Property used in the ordinary course of the Business and (ii) all required filings and fees owed by Seller related to Seller's Intellectual Property have been timely filed with and paid to the relevant Governmental Authorities.

(c)     Except as set forth in Schedule 3.10(c), to Seller's Knowledge:  (i) the conduct of the Business, as currently conducted, does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any other Person; and (ii) no other Person is infringing, misappropriating or otherwise violating any Intellectual Property of Seller.

(d)     The Intellectual Property set forth on Schedule 3.10(a) is all of the Intellectual Property necessary to operate the Business as presently conducted.

(e)     There are no actions, suits, claims or other legal proceedings pending, in each case before a Governmental Authority, or to Seller's Knowledge threatened:  (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person by Seller in connection with the Business or (ii) challenging the validity, enforceability, registrability or ownership of any of Seller's Intellectual Property.

(f)     The representations and warranties set forth in this Section 3.10 are the exclusive representations and warranties made by Seller with respect to Intellectual Property.

Section 3.11     Financial Advisors.  No agent, broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

Section 3.12     No Other Representations and Warranties. Except for the representations and warranties contained in this ARTICLE 3 (including the related portions of the Disclosure Schedules), Seller has not and no Affiliate or Representative of Seller, or any other Person, has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information furnished or made available to Buyer and its Representatives (including any projections, information, documents or material made available to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business or any representation or warranty arising from statute or otherwise in law.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 4.1     Organization. Buyer is a Delaware limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 4.2     Due Authorization, Execution and Delivery; Enforceability. Buyer has the requisite company power and authority to enter into this Agreement, to carry out its obligations

hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite [corporate/company] action. This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.3    No Conflicts; Consents.  The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not:  (a) result in a violation or breach of any provision of the organizational documents of Buyer, (b) result in a violation or breach of any material Governmental Order applicable to Buyer, or (c) require the consent of any Person under, conflict with, result in a material violation or breach of, constitute a material default or an event that, with or without notice or lapse of time or both, would constitute a material default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel, any material contract of Buyer.  No consent, approval, Permit, Governmental Order (other than in connection with the Chapter 11 Case), declaration or filing with, or notice to, any Governmental Authority or other Person is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.4    Financial Advisors.  No agent, broker, finder, investment banker or other Person is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

Section 4.5    Solvency.  Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall:  (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities), and (c) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller.  In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

Section 4.6    Legal Proceedings.  There are no actions, suits, claims or other legal proceedings pending against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

Section 4.7    Independent Investigation. Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets. Buyer acknowledges and agrees that:  (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE 3 (including the related portions of the Disclosure Schedules), and (b) none of Seller, any Affiliate or Representative of Seller or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller.

**ARTICLE 5**
**COVENANTS**

Section 5.1    Conduct of Business Prior to the Closing.  From the date hereof until the Closing:

(a)     Seller shall use its commercially reasonable efforts to:

(i)     maintain and preserve intact the current organization, business and franchise of the Business and to preserve the rights, franchises, goodwill and relationships of the customers, lenders, suppliers, regulators and others having business relationships with the Business; and

(ii)     pay all Taxes when due with respect to the Purchased Assets required to be paid by Seller and not allow the Purchased Assets to become subject to a lien for Taxes required to be paid by Seller, other than for Taxes not yet due and payable.

(b)     Except (i) as expressly required or permitted by this Agreement, (ii) as required pursuant to applicable Laws or any Governmental Authority, (iii) as consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), or (iv) as required to respond reasonably and prudently to an emergency or disaster (including the right to take forthwith any action required to insure the safety and integrity of the Business), Seller shall not:

(i)     acquire any business, other than acquisitions with a purchase price that does not exceed $250,000 individually or $1,000,000 in the aggregate;

(ii)     sell, transfer, dispose of, lease, encumber, relinquish or abandon any of the Purchased Assets, except (A) sales and other dispositions in the ordinary course of business or (B) sales, transfers or dispositions that do not exceed $25,000 in the aggregate (excluding those sales described in clause (A));

(iii)     outside the ordinary course of business, enter into any Contract that would reasonably be likely to become an Assigned Contract;

(iv)     incur any indebtedness for borrowed money that will constitute an Assumed Liability other than indebtedness under the Loan Agreement, short-term indebtedness, letters of credit or sureties in the ordinary course of business;

(v)     make any loans or advances that will be a Purchased Asset to any Person or assume or guarantee the liabilities of any Person that will constitute an Assumed Liability;

(vi)     settle, offer or propose to settle, compromise, assign or release any material proceeding brought against Seller in respect of or in connection with the Business or the Purchased Assets;

(vii)     enter into any agreement creating a joint venture or partnership or effecting a business combination or other similar arrangement with another Person in respect of the Business or the Purchased Assets;

(viii)     pay or promise to pay any wage or salary increase, bonus, deferred compensation, consulting amount, or other amount to any employee, officer, director, or contractor that increases Seller's expenditures or liabilities to any employee, officer, director, or contractor outside the ordinary course of business or beyond the amounts of the Petition Date; and

(ix)     attempt or agree to do any of the foregoing matters listed in clauses (i) through (viii) above.

Section 5.2     Access to Information. From the date hereof until the Closing, Seller shall: (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business or the Purchased Assets, (b) furnish Buyer and its Representatives with such financial,

operating and other data and information related to the Business or the Purchased Assets as Buyer or any of its Representatives may reasonably request, and (c) instruct the Representatives of Seller to use commercially reasonable efforts to cooperate with Buyer in its access to and inspection of the Purchased Assets and the Business; provided, however, that any such access or inspection shall be conducted at Buyer's sole risk and at Buyer's sole cost and expense during normal business hours upon at least two (2) Business Days' prior written notice to Seller, under the supervision of Seller's personnel, in compliance with all of Seller's health, safety and environmental regulations and procedures, and in such a manner as not to interfere with the normal operations of the Business. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Seller's discretion:  (x) cause significant competitive harm to Seller and/or the Business if the transactions contemplated by this Agreement are not consummated, (y) jeopardize any attorney-client or other privilege, or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Seller, Buyer shall not contact any suppliers to, or customers of, the Business, and Buyer shall have no right to perform invasive or subsurface investigations of any properties.  Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided under this Agreement.

Section 5.3    Notice of Certain Events.  Seller and Buyer agree that, subject to applicable Law, each shall provide the other prompt notice in writing of:

(a)    any notice or communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any material notice or communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(c)    any material proceeding commenced or threatened against it which relates to the consummation of the transactions contemplated by this Agreement, other than the Chapter 11 Case; and

(d)    any failure by it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied under this Agreement; provided that the giving of any such notice shall not in any way (i) change or modify the representations and warranties of the parties hereto or the conditions in their favor contained in this Agreement or otherwise affect the remedies available to Seller or Buyer under this Agreement, (ii) have any effect on the satisfaction of any of the conditions to closing set forth in ARTICLE 6, or (iii) be deemed to amend or supplement the Disclosure Schedules.

Section 5.4    Governmental Approvals and Other Third-Party Consents.

(a)    Each party hereto shall, as promptly as possible, use commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement, except for consents, authorizations, orders and approvals with respect to Permits that cannot be obtained until after the Closing. Each party shall reasonably cooperate with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    With respect to the Permits, Buyer will meet with the relevant state and federal agencies with respect to the modification, transfer, replacement or reissuance, as applicable, of

such Permits, which shall occur following Closing. Each party shall use commercially reasonable efforts to cause the modification, transfer, replacement or reissuance, as applicable, of the Permits promptly following Closing, provided that Seller shall not be obligated to pay any consideration in connection therewith and/or to incur any third party expenses or reimbursement obligations to Buyer in doing so. Following the Closing, Seller shall, to the extent permitted by Law, maintain each Permit (each a "Transition Permit") in full force and effect until each such Permit has been modified, transferred, replaced or reissued, as applicable, and Seller shall allow Buyer to own, use, develop and operate the Purchased Assets under each such Transition Permit until such time as each such Transition Permit has been modified, transferred, replaced or reissued, as applicable, provided that Seller shall not be obligated to pay any consideration in connection therewith and/or to incur any third party expenses or reimbursement obligations to Buyer in doing so.  Following the Closing, if Seller receives a notice of violation or of any other Loss under any Transition Permit prior to the transfer or reissuance of such Transition Permit, which is based on or arises out of the activities or operations of Buyer after Closing, Seller will promptly notify Buyer, and Buyer shall be responsible for contesting or curing such violation and for any Loss, obligation or liability associated therewith. Buyer shall indemnify Seller for any obligations or liabilities associated with any such notice of violation of a Transition Permit or Loss related thereto following Closing.  Notwithstanding anything in this Agreement to the contrary, this Section 5.4 shall survive the Closing without limitation.

(c)      Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents or waivers from, all third parties that are described in Schedule 3.3; provided, however, that (i) the foregoing shall not require Seller or Buyer to give notices to (other than the notices provided for in Section 5.12(e)(ii)), or obtain consents or waivers from, any non-Debtor parties to Assigned Contracts regarding assignments thereof to Buyer and (ii) neither Seller nor Buyer shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested, other than customary filing fees.

Section 5.5     Books and Records.

(a)      In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of seven (7) years after the Closing, Buyer shall: (i) retain the Books and Records (including personnel files) of the Business relating to the period prior to Closing, and (ii) upon reasonable notice, afford the Representatives of Seller (and any trustee or liquidating trustee appointed in the Chapter 11 Case) reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to Buyer's personnel and employees, to Buyer's computer service and other equipment, and to those portions, and only those portions, of such Books and Records as relate to the period prior to Closing and, if required by Buyer, subject to Seller executing a non-disclosure agreement with respect to such information, in form and substance acceptable to the parties hereto, acting reasonably.

(b)      Buyer shall not be obligated to provide Seller with access to any books or records (including personnel files) pursuant to this Section 5.5 where such access would violate any Law.  Notwithstanding anything in this Agreement to the contrary, this Section 5.5 shall survive the Closing without limitation.

Section 5.6     Closing Conditions. From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in ARTICLE 6 for which it is responsible.

Section 5.7     Public Announcements.  Seller and Buyer shall consult with each other prior to issuing any press releases or otherwise making public statements with respect to this Agreement or the transactions contemplated by this Agreement and, to the extent practicable, shall provide the other party with an opportunity to review and comment on all such press releases or statements prior to the release thereof.  To the extent that any such press release or public statement is required by applicable Law, by a rule of a stock exchange on which a party's shares (or those of any of its Affiliates) are

listed or traded or by a Governmental Authority, the press release or public announcement shall, to the extent practicable, be issued or made after consultation with the other party hereto and taking into account such other party's comments, provided that such consultation does not, and reasonably would be expected not to, cause non-compliance with any such Law or rule. If such advance consultation is not reasonably practicable or legally permitted, to the extent permitted by applicable Law, the disclosing party shall provide the other party with a copy of any written disclosure made by such disclosing party as soon as practicable thereafter.

Section 5.8    Further Assurances. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to vest title to the Purchased Assets in Buyer, carry out the provisions hereof and give effect to the transactions contemplated by this Agreement, in each case, at the sole cost and expense of the requesting party. Without limiting the generality of the foregoing, during the thirty (30) day period following the Closing, Buyer shall afford the Representatives of Seller reasonable access, during normal business hours, to Buyer's property for the purpose of recovering and/or removing any of the Excluded Assets remaining on such property. Notwithstanding anything in this Agreement to the contrary, this Section 5.8 shall survive the Closing without limitation.

Section 5.9    Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement (including any real property transfer Tax and any other similar Tax) (all such Taxes collectively, "Transfer Taxes") shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return with respect to Transfer Taxes (and Seller shall cooperate with respect thereto as necessary). Each of Buyer and Seller agrees to timely sign and deliver (or to cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate and otherwise to cooperate to establish any available exemption from (or otherwise reduce) any Transfer Taxes.

Section 5.10    Nature of Transaction.

(a)    Seller is selling, and Buyer is acquiring, the Purchased Assets "AS IS", "WHERE IS" and "WITH ALL FAULTS, LIMITATIONS AND DEFECTS (HIDDEN AND APPARENT)" and subject only to the representations and warranties contained in ARTICLE 3, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied), including as to title, quality, merchantability or fitness for Buyer's intended use or a particular purpose or any use or purpose whatsoever.

(b)    Further, except as set forth in this Agreement, neither Seller nor any director, officer, manager, employee, agent, consultant, or Representative of Seller, nor any other Person has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets, or the physical condition of the Purchased Assets.

(c)    Buyer acknowledges and agrees that it is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of property and assets such as the Purchased Assets as contemplated hereunder. Buyer acknowledges and agrees that it has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.

(d)    Buyer and Seller further acknowledge that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms'-length negotiation.

(e)     Buyer has relied, and shall rely, solely upon its own investigation of all such matters and the representations, warranties and covenants contained in ARTICLE 3.

(f)     Following the Closing, each of the parties hereto hereby agrees and acknowledges that (a) the parties hereto hereby disclaim all Losses and responsibility for any representation or warranty (including any representation or warranty set forth in ARTICLE 3 or ARTICLE 4 or any express or implied warranty, any warranty as to accuracy or completeness or any warranty as to fitness for a particular purposes), omission, agreement, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to the other party hereto or its Affiliates or Representatives or any other Person (including any opinion, information, projection, or advice that may have been or may be provided, directly or indirectly (including on or by access to any online data room), to the other party hereto or its Affiliates or Representatives by any director, officer, manager, employee, agent, consultant, or Representative of such party); (b) Seller makes no representations or warranties to Buyer regarding the probable success, profitability or value of any of the Purchased Assets; and (c) no party hereto shall have any liability with respect to, and no party hereto shall be permitted nor shall it assert any indemnification claim, liability or Loss with respect to, the foregoing matters, whether pursuant to this Agreement, common law, or otherwise.

Section 5.11   Supplements to Schedules.   Prior to the Cut-Off Date, Seller shall have the right from time to time to supplement, modify or update the Disclosure Schedules upon written notice to Buyer.   Upon receipt of any such supplement, modification or update that in the reasonable judgment of Buyer would cause the condition set forth in Section 6.2(a) to not be satisfied at the Closing, Buyer shall have ten (10) Business Days from the date of receipt to object to such supplement, modification or update and, in the event of such an objection, the Disclosure Schedules shall not be deemed to have been supplemented, modified or updated with respect to such objected to item; provided, however, that if Buyer fails to so object within the ten (10)-Business Day period or accepts any portion of the supplement, modification or update, such supplement, modification or update (or portion with respect to which Buyer does not object) shall be deemed to supplement, modify or update the Disclosure Schedules and Seller shall not be deemed to have breached or violated any of its respective representations, warranties, covenants or agreements in this Agreement with respect thereto.

Section 5.12   Bankruptcy Matters.

(a)     Auction.   Seller shall seek entry of the Sale Order following an auction or other competitive bidding process and shall take reasonable steps to obtain entry of the Sale Order as soon as reasonably practicable.

(b)     Bid Procedures Order. Seller shall seek entry of a Bid Procedures Order by the Bankruptcy Court pursuant to which, among other things, Seller shall conduct a competitive sale process and solicit bids for the sale and purchase of substantially all of its assets or any portion thereof, and, in the event more than one qualified bid is received for any asset of Seller in accordance with such approved procedures, Seller shall conduct an auction for such assets. This Agreement and transactions contemplated hereby are contingent upon and subject to:

(i)     entry of the Bid Procedures Order and the approved sale process,

(ii)     any auction conducted in connection with such approved sale process, and the

(iii)     ultimate selection of this Agreement and the transactions contemplated hereby by the Debtor as the highest and best bid for the Purchased Assets following the completion of the approved sale process; and

(iv)     auction.

(c)     Stalking Horse Designation. Subject to the entry of the Bid Procedures Order authorizing Seller to designate one or more stalking horse purchaser(s) for the Assets or any portion thereof, Seller shall designate Buyer as a stalking horse purchaser (the "Stalking Horse") with the respect to the Purchased Assets and will file a Notice of Designation of Stalking Horse with the Bankruptcy Court as soon as practicable following the execution of this Agreement disclosing such designation and the Stalking Horse Protections granted by Section 5.12(d).

(d)     Stalking Horse Protections. Subject to the entry of the Bid Procedures Order authorizing Seller to grant protections to a stalking horse purchaser, Seller hereby grants Buyer the following stalking horse protections (the "Stalking Horse Protections") to the extent authorized by the Bid Procedures Order:

(i)     Break-Up Fee. Sellers shall pay to Buyer cash in an amount equal to the greater of $100,000 or three percent of the Purchase Price (the "Break-Up Fee") only in the event that Seller consummates a sale or a transfer of all or a material portion of the Purchased Assets to a third party whose bid was (A) selected by the Seller as a higher and better bid through the approved sale and auction process pursuant to the Bid Procedures Order and (B) approved by the Bankruptcy Court. In the event that the Break-Up Fee is payable pursuant to the preceding sentence, (1) the Break-Up Fee shall be paid out of the cash sale proceeds received from a sale of Purchased Assets to such third party, and (2) no lien of any third party shall attach to the portion of the sale proceeds representing the Break-Up Fee. If the Break-Up Fee becomes due and payable, it shall be paid to Buyer within ten days of the event triggering payment of the Break-Up Fee and shall be treated as an allowed administrative expense claim in the Bankruptcy Case. The obligation to pay the Break-Up Fee shall be junior to the post petition liens and superpriority claims of PMC, but shall be shall be senior to all other liens, security interests, and superpriority claims. The provisions of this Section 5.12(d)(i) shall survive any termination of this Agreement pursuant to Section 7.1(b).

(ii)     Expense Reimbursement. Sellers shall reimburse Buyer for all actual and reasonable out of pocket fees and expenses, including reasonable attorney fees, incurred by Buyer in connection with this Agreement and the transactions contemplated thereby up to a cap of $50,000. The payment of such amounts shall (A) be subject to the occurrence of the same circumstances that will trigger the payment of the Break-Up Fee, (B) be paid in cash in the same manner and at the same time as the Break-Up Fee is to be paid, and (C) shall be junior to the post petition liens and superpriority claims of PMC, but shall be shall be senior to all other liens, security interests, and superpriority claims.

(iii)     Bidding Increments. In the event more than one qualified bid is received by Sellers in accordance with the procedures approved by the Bid Procedures Order for the Purchased Assets or any portion thereof, and an auction is held with respect to the Purchased Assets or any portion thereof, bids during the auction must be in increments of at least $200,000 greater than the existing bid for such assets, with the first such bid having to (A) include cash in an amount equal to the Break-Up Fee and amount required to be paid as expense reimbursement under this Agreement, plus (B) an overbid of at least $100,000.

(e)     Compliance.

(i)     Seller shall comply with all of its obligations under the Sale Order (after the entry of such Sale Order by the Bankruptcy Court).

(ii)     Seller shall use commercially reasonable efforts to comply with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.

(iii)     Seller shall move to assume and assign to Buyer the Assigned Contracts that are executory contracts capable of being assumed and assigned pursuant to section 365

of the Bankruptcy Code and shall provide notice thereof to (A) all counterparties to such contracts, (B) any third party beneficiary to such contracts as reasonably requested by Buyer (which third party beneficiaries shall be identified by Seller using its commercially reasonable best efforts), (C) any other Person that Buyer reasonably requests, and (D) any other Person as may be required by applicable Bankruptcy Rules and any applicable local rules of the Bankruptcy Court. Seller has the right to reject any Contract that is not an Assigned Contract in accordance with the Bankruptcy Code.

(f)     <u>Environmental Matters</u>.   Nothing in the Sale Order or this Agreement releases, discharges, nullifies, precludes, or enjoins the enforcement of any environmental liability to any Governmental Authority that any Person would be subject to as the owner or operator of the Purchased Assets after the Closing Date. Nothing in the Sale Order shall authorize the transfer or assignment to Buyer of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under non-bankruptcy Law governing such transfers or assignments. Notwithstanding the foregoing sentence, nothing in the Sale Order shall: (A) be interpreted to deem Buyer as the successor to the Debtor under any successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to the Closing Date or for liabilities relating to off-site disposal of waste by the Debtor prior to the Closing Date; (B) create for any Governmental Authority any substantive right that does not already exist under Law; or (C) be deemed or construed to be an admission of liability by the Debtor.

(g)     <u>Sale Order</u>.   This Agreement and the transactions contemplated hereby are contingent upon and subject to approval of the Bankruptcy Court through the entry of a Sale Order. The Sale Order will provide, among other things, that pursuant to sections 363 and 365 of the Bankruptcy Code:

(i)     the Purchased Assets shall be sold to Buyer free and clear of all Encumbrances (except for Permitted Encumbrances and Assumed Liabilities);

(ii)     to the extent that (A) there are restrictions on the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset or (B) the same would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), then (1) such consent, authorization, approval or waiver is not required and/or (2) the Purchased Asset subject to such consent, authorization, approval or waiver shall be assigned or transferred regardless of any such restriction or necessary consent, authorization, approval or waiver and that there shall be no breach or adverse effect on the rights of Seller or Buyer for the failure to obtain any such consent, authorization, approval or waiver or otherwise comply with such restriction;

(iii)     the transactions contemplated by this Agreement were negotiated at arm's length, that Buyer acted in good faith in all respects and Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iv)     the terms and conditions of the sale of the Purchased Assets to Buyer as set forth herein are approved;

(v)     Seller is authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(vi)     Buyer and Seller did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(m) of the Bankruptcy Code; and

(vii)     the Sale Order is binding upon any successors to Seller, including any trustees in respect of Seller or the Purchased Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code.

(h)     If the Sale Order is appealed, Buyer and Seller shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(i)     Seller further covenants and agrees that the terms of any plan of reorganization or liquidation, or any order of dismissal, submitted to the Bankruptcy Court by Seller shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

**ARTICLE 6**
**CONDITIONS TO CLOSING**

Section 6.1     Conditions to Obligations of All Parties.  The obligations of Seller and Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following condition: no Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following completion thereof and there shall not have been enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited.

The foregoing condition is for the exclusive benefit of Seller and Buyer and any such condition may be waived in whole or in part by Seller and Buyer at or prior to the time of Closing by each delivering to the other a written waiver to that effect.  Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Seller or Buyer may have, including any claims Seller or Buyer may have for breach of covenant, representation or warranty by the other party, and also without prejudice to Seller's and Buyer's rights of termination in the event of non-performance of any other conditions in whole or in part.

Section 6.2     Conditions to Obligations of Buyer.   The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Seller contained in ARTICLE 3 shall be true and correct in all material respects.

(b)     There shall be no Material Adverse Effect as of the Closing Date and Seller shall have delivered to Buyer a certificate executed by Chris Sugai attesting that no Material Adverse Effect has occurred.

(c)     Seller shall provide a certificate, executed by an officer, attesting that the outstanding amount of the ABL does not exceed the borrowing base restrictions set forth in the ABL and attesting that Seller has not received any funds, whether from PMC or any additional source, that, in aggregate, would cause the Company to exceed the lending limits and borrowing restrictions set forth in the ABL.

(d)     Seller shall have duly performed and complied in all material respects with all material agreements, covenants and conditions required by this Agreement to be performed or complied with by Seller prior to or on the Closing Date and Seller shall have delivered to Buyer a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to Seller's agreements, covenants and conditions.

(e)     Seller shall have delivered to Buyer a certificate from Chris Sugai certifying that attached thereto are true and complete copies of the constituent documents of Seller, all resolutions adopted by the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

(f)     Buyer shall have received a certificate of good standing for Seller from the Secretary of State of the State of Colorado.

(g)     Seller shall have delivered to Buyer duly executed counterparts of each other document, certificate and instrument set forth in Section 2.9(a) to be executed and delivered by Seller.

(h)     The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Buyer in its sole and absolute discretion, and, as of the Closing Date the Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of Buyer.

(i)     The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari. Notwithstanding anything herein to the contrary, the parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that Buyer is a "Good Faith Purchaser" pursuant to section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section of the Bankruptcy Code.

(j)     The Assigned Contracts shall have been assumed by Seller, as applicable, and assigned to Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code.

(k)     Seller shall have delivered to Buyer a certificate executed by Chris Sugai attesting that all Closing Conditions have been satisfied.

The foregoing conditions are for the exclusive benefit of Buyer and any such condition may be waived in whole or in part by Buyer at or prior to the time of Closing by delivering to Seller a written waiver to that effect executed by Buyer. Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Buyer may have, including any claims Buyer may have for breach of covenant, representation or warranty by Seller, and also without prejudice to Buyer's rights of termination in the event of non-performance of any other conditions in whole or in part.

Section 6.3     Conditions to Obligations of Seller. The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in ARTICLE 4 shall be true and correct in all material respects as of the Closing Date as if made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, then as of such date) and Buyer shall have delivered to Seller a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to Buyer's representations and warranties.

(b)     Buyer shall have duly performed and complied in all material respects with all material agreements, covenants and conditions required by this Agreement to be performed or complied with by Buyer prior to or on the Closing Date and Buyer shall have delivered to Seller a certificate dated the Closing Date executed by a senior officer to the foregoing effect with respect to its agreements, covenants and conditions.

(c)     Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of the constituent documents of Buyer, all resolutions adopted by the [board of directors] of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby.

(d)     Seller shall have received a certificate of good standing for Buyer from the Secretary of State of Buyer's jurisdiction of incorporation or organization, as applicable.

(e)     Buyer shall have delivered to PMC the PMC Cash Amount, less the Escrow Deposit, shall have delivered to Seller the Additional Cash Amount, and shall have caused the Escrow Deposit to be delivered to PMC in accordance with Section 2.7, and Buyer shall have delivered evidence to Seller that the Cure Amounts have been or will be paid.

(f)     Buyer shall have delivered to Seller duly executed counterparts of each other document, certificate and instrument set forth in Section 2.9(b) to be executed and delivered by Buyer.

(g)     Buyer shall have delivered to Seller evidence reasonably satisfactory to Seller that Buyer has satisfied the covenants set forth in this Agreement. The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to Seller, and no Governmental Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(h)     The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari. Notwithstanding anything herein to the contrary, the parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that Buyer is a "Good Faith Purchaser" pursuant to section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section of the Bankruptcy Code.

(i)     The Assigned Contracts shall have been assumed by Seller, as applicable, and assigned to Buyer pursuant to sections 365(a) and 365(F) of the Bankruptcy Code.

The foregoing conditions are for the exclusive benefit of Seller and any such condition may be waived in whole or in part by Seller at or prior to the time of Closing by delivering to Buyer a written waiver to that effect executed by Seller. Delivery of any such waiver shall be without prejudice to any rights and remedies at law and in equity Seller may have, including any claims Seller may have for breach of covenant, representation or warranty by Buyer, and also without prejudice to Seller's rights of termination in the event of non-performance of any other conditions in whole or in part.

## ARTICLE 7
## TERMINATION

Section 7.1     Termination by the Parties. This Agreement may be terminated at any time prior to the Closing Date:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer by written notice to Seller if:

(i)     the Closing has not occurred on or prior to January 31, 2018 (the "Drop Dead Date"), except that the right to terminate this Agreement under this Section 7.1(b)(i) shall

not be available to Buyer if Buyer's failure to fulfill any of Buyer's covenants or obligations or if the breach of any of Buyer's representations and warranties under this Agreement, as applicable, has been the cause of, or resulted in, the failure of the Closing to occur by the Drop Dead Date;

(ii)     any of the conditions set forth in Section 6.1 or Section 6.2 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Buyer is not then in breach of this Agreement so as to cause any of the conditions in Section 6.1 or Section 6.2 not to be satisfied;

(iii)     the Sale Order, once entered, is changed in a manner that is materially adverse to Buyer without the consent of Buyer in its reasonable discretion;

(iv)     Seller seeks to have the Bankruptcy Court enter an order dismissing the Chapter 11 Case of Seller or converting it to a case under chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Chapter 11 Case of Seller or converting the Chapter 11 Case of Seller to a case under chapter 7 of the Bankruptcy Code, or appoints a trustee in Seller's Chapter 11 Case or an examiner with enlarged powers relating to the operation of Seller's businesses, and such dismissal, conversion or appointment is not reversed or vacated within three Business Days after the entry thereof; or

(v)     There is any Material Adverse Effect.

(c)     by Seller by written notice to Buyer if:

(i)     There is no Material Adverse Effect and Buyer is not otherwise entitled to Terminate this Agreement in accordance with Section 7.1(b); or

(ii)     the Closing has not occurred on or prior to the Drop Dead Date, except that the right to terminate this Agreement under this Section 7.1(c)(ii) shall not be available to Seller if any of the provisions of Section 7.1(b) have occurred or are applicable, or if Seller's failure to fulfill any of Seller's covenants or obligations or if the breach of any of Seller's representations and warranties under this Agreement, as applicable, has been the cause of, or resulted in, in whole or in part, the failure of the Closing to occur by the Drop Dead Date; or

(iii)     any of the conditions set forth in Section 6.3 shall not have been satisfied or waived by the Drop Dead Date or is incapable of satisfaction by the Drop Dead Date, provided that Seller is not then in breach of this Agreement so as to cause any of the conditions in Section 6.3 not to be satisfied; or

(iv)     the board of directors of Seller shall have determined in good faith, after considering applicable Law and consulting with outside counsel, that such termination is required by its fiduciary obligations under applicable Law; or

(v)     Seller consummates a sale or transfer of all or a material portion of the Purchased Assets to a third party whose bid was (A) selected by the Debtor as a higher and better bid through the approved sale and auction process pursuant to the Bid Procedures Order and (B) approved by the Bankruptcy Court.

(d)     by Buyer or Seller in the event that:

(i)     any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement or causing the transactions contemplated by this Agreement to be rescinded following completion thereof, and such Governmental Order shall have become permanent, final and non-appealable;

(ii)      there shall be enacted or made applicable any Law that makes the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(iii)      a court issues a final non-appealable order that prevents Seller from selling the Purchased Assets to Buyer.

Section 7.2      Effect of Termination.

(a)      In the event of termination by either party hereto of this Agreement pursuant to this ARTICLE 7, written notice thereof shall as promptly as practicable be given to the other party and thereupon this Agreement shall terminate and the transactions contemplated hereby shall be abandoned without further action by the parties hereto.  In the event of the termination of this Agreement pursuant to Section 7.1(a) or Section 7.1(d), except as provided in Section 7.2(b), this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto. Upon termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the Government Authority to which they were made.

(b)      Notwithstanding any other provisions of this Agreement, if this Agreement is terminated (whether by a party or automatically or otherwise), the provisions of Section 5.7, Section 5.12(d), ARTICLE 6, ARTICLE 7, Section 8.2, Section 8.3, Section 8.11, and Section 8.13 (subject to any time limitations referred to therein) shall survive such termination and remain in full force and effect, along with any other provisions of this Agreement which expressly or by their nature survive the termination hereof.

## ARTICLE 8
## MISCELLANEOUS

Section 8.1      Survival.Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall expire and be of no further force and effect as of the Closing and no party hereto shall thereafter have any liability whatsoever with respect thereto; provided, however, that the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the parties hereto following the Closing shall survive in accordance with their respective terms. Following the Closing Date with respect to the representations, warranties, and agreements contained in this Agreement or in any instrument delivered pursuant to this Agreement and, with respect to the covenants contained in this Agreement or in any instrument delivered pursuant to this Agreement, following the applicable survival date of such covenant, such representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall terminate and be of no further force or effect and no party hereto shall have any liability with respect thereto.

Section 8.2      Expenses; Attorneys' Fees.  Except as otherwise expressly provided herein (including in Section 5.9), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.  In the event that Buyer or Seller brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including all court costs and reasonable attorneys' fees).

Section 8.3      Notices.  All notices, requests, consents, claims, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the

recipient, and on the next Business Day if sent after normal business hours of the recipient, or (d) when received by the addressee if mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.3):

If to Seller:               Niner, Inc.
                            2330 East Prospect, Suite 1
                            Attn: Chris Sugai, Chief Executive Officer
                            Email: chrissugai@gmail.com

with a copy to:             Markus Williams Young & Zimmermann
                            1700 Lincoln Street
                            Suite 4550
                            Denver, Colorado 80203
                            Attn: James T. Markus
                            Email: jmarkus@markuswilliams.com

If to Buyer:                Niner Acquisition LLC
                            210 University Blvd
                            Suite 660
                            Denver, Colorado 80206
                            Attn: Brady Dolsen
                            Email: bdolsen@columbiabasinpartners.com

with a copy to:             Baker & Hostetler LLP
                            1801 California Street
                            Suite 4400
                            Denver, Colorado 80202
                            Attn: Lars Fuller
                            Email: lfuller@bakerlaw.com

Section 8.4      Interpretation. For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation", (b) unless the context otherwise requires, the word "or" is not exclusive, and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Articles and Sections mean the Articles and Sections of this Agreement, (ii) to Schedules mean the Schedules attached to the Disclosure Schedules, (iii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time, if applicable, to the extent permitted by the provisions thereof, and (iv) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. Each of the individuals executing this Agreement and any agreement, document or instrument related hereto is doing so on behalf of the applicable entity, in his or her capacity as an authorized representative of such entity, and is not doing so in his or her individual capacity.

Section 8.5      Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

Section 8.6      Severability. Any term, provision, or paragraph of this Agreement which is determined in any jurisdiction to be prohibited, unenforceable, illegal, void, voidable, or unenforceable shall not affect any other term or provision of this Agreement so long as the economic

or legal substance of the transactions contemplated hereby does not constitute a Material Adverse Effect.

Section 8.7    Entire Agreement. This Agreement and the Confidentiality Agreement constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

Section 8.8    Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Seller may not assign its rights or delegate its obligations hereunder without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed.  Buyer may assign its rights and delegate its obligations hereunder without the prior written consent of Seller. Assignment and delegation shall relieve the assigning party of any of its obligations hereunder provided that each such assignee and delegate assumes all such obligations in writing.

Section 8.9    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.10    Amendment and Modification; Waiver. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 8.11    Governing Law; Submission to Jurisdiction; Venue. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

Section 8.12    Liquidated Damages as Sole Remedy of Buyer and Seller.

(a)    THE PARTIES HERETO ACKNOWLEDGE THAT BUYER'S ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.    THEREFORE, THE PARTIES HERETO ACKNOWLEDGE THAT THE AMOUNT OF THE BREAK-UP FEE AS SET FORTH IN Section 5.12(d) OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF BUYER'S DAMAGES, AND AS BUYER'S SOLE AND EXCLUSIVE REMEDY AGAINST SELLER, WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND DISCLOSURE

SCHEDULES HERETO OR ANY AGREEMENT, DOCUMENT OR INSTRUMENTS RELATED HERETO, INCLUDING THE FAILURE OF SELLER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR DISCLOSURE SCHEDULES HERETO OR ANY AGREEMENT, DOCUMENT OR INSTRUMENTS RELATED HERETO.

(b)     THE PARTIES HERETO ACKNOWLEDGE THAT SELLER'S ACTUAL DAMAGES IN THE EVENT THAT THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. THEREFORE, THE PARTIES HERETO ACKNOWLEDGE THAT THE AMOUNT OF THE ESCROW DEPOSIT AS SET FORTH IN Section 2.7(c) OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF SELLER'S DAMAGES, AND AS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER, WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND DISCLOSURE SCHEDULES HERETO AND EACH AGREEMENT, DOCUMENT OR INSTRUMENTS RELATED HERETO, INCLUDING THE FAILURE OF BUYER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR DISCLOSURE SCHEDULES HERETO OR ANY AGREEMENT, DOCUMENT OR INSTRUMENTS RELATED HERETO.

Section 8.13     Limitation on Damages. In no event shall any party be liable to any other party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement or diminution of value or any damages based on any type of multiple.

Section 8.14     Disclosure Schedules. The information in the Disclosure Schedules constitutes exceptions or qualifications to representations and warranties of Seller as set forth in this Agreement. Any disclosure made in the Disclosure Schedules shall be deemed to be disclosures made with respect to all representations and warranties contained in this Agreement to the extent reasonably apparent on their face, regardless of whether or not a specific cross-reference is made thereto. No disclosure on the Disclosure Schedules relating to a possible breach or violation of any Contract or Law shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Capitalized terms used in the Disclosure Schedules that are not defined therein shall have the meaning given them in this Agreement.

Section 8.15     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement. Any party's failure to provide an original signature shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 8.16     Non-Recourse. No past, present or future stockholder, director, officer, employee, or incorporator of Seller or Buyer shall have any liability for any obligation or liability of Seller or Buyer, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the transactions contemplated by this Agreement.

Section 8.17     Advice of Counsel. Each of Seller and Buyer acknowledges that it has discussed with its counsel, and has obtained adequate information concerning the relevant implications, advantages, and risks of, and reasonably alternatives to, the waivers, permissions and other provisions of this Agreement.

*[Signature Page Follows]*

The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER**:

NINER, INC., a Colorado corporation

By: _____
Name: _____
Title: _____

**BUYER**:

NINER ACQUISITION LLC

By: _____
Name:  Brady Dolsen
Title:  Manager

      The parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLER:**

NINER, INC., a Colorado corporation

By:_____
Name:
Title:

**BUYER:**

NINER ACQUISITION LLC

By:_____
Name:  Brady Dolsen
Title:  Manager

SCHEDULES
TO
ASSET PURCHASE AGREEMENT

These Schedules have been prepared by Niner, Inc., a Colorado corporation, as Seller pursuant to that certain Asset Purchase Agreement dated November 27, 2017, by and between Niner, Inc. and Niner Acquisition LLC to which these Schedules have been attached (the "Agreement"). Unless the context otherwise requires, all capitalized terms herein have the same meanings given to such terms in the Agreement.

The section numbers of these Schedules correspond to the first or principal section of the Agreement to which the information contained therein relate. However, because an item of information may apply to multiple sections of the Agreement, all information contained herein shall be deemed to have been disclosed under and incorporated into any section herein to which such information is relevant. Section headings are provided for convenience only.

Unless otherwise stated, all statements made herein are made as of the date of the execution of the Agreement.

Where an agreement or other item has been summarized or described in these Schedules, such summary or description does not purport to be a complete statement of all of the material terms of such agreement or other item. Document summaries herein are provided solely for the benefit of the Buyer and merely supplement the disclosure, read as a whole, provided in such documents.

Nothing herein constitutes an admission of any liability or obligation on the part of Seller, or an admission against its interests. The inclusion of any schedule herein or any exhibit hereto should not be interpreted as indicating that any determination has been made that the agreement or other matter disclosed in the schedule is necessarily "material" to Seller, the Business or the Purchased Assets. Also, matters reflected in these Schedules are not necessarily limited to matters required by the Agreement to be reflected herein; such additional matters are included for informational purposes. Except as otherwise set forth in the Agreement no representation or warranty is intended to be expressed and should not be implied by these Schedules. The Buyer acknowledges that certain information contained in these schedules may constitute material confidential information relating to Seller which may not be used for any purpose other than that contemplated in the Agreement.

**Niner, Inc.**
Assets & Tangible Property Listing
Schedule 2.1 (a)

| Account | Debit | Credit | DR <CR> | TO BUYER |
|---|---|---|---|---|
| **1000 - Cash and Equivalents** | | | | |
| 1003 - FN Merchant Services | $19,983.14 | | $ 19,983.14 | $ 19,983.14 |
| 1004 - Paypal Deposit Account | $892.22 | | $ 892.22 | $ 892.22 |
| 1006 - Petty Cash | $3,417.40 | | $ 3,417.40 | $ 3,417.40 |
| 1008 - Wells Fargo Bank - Lockbox | $52,760.92 | | $ 52,760.92 | $ 52,760.92 |
| 1012 - First National - Operating Account | $13,192.23 | | $ 13,192.23 | $ 13,192.23 |
| 1013 - Retail Store Cash | $269.33 | | $ 269.33 | $ 269.33 |
| 1020 - Taiwan Bank Account - USD | $6,935.05 | | $ 6,935.05 | $ 6,935.05 |
| 1021 - Taiwan Bank Account - TWD | $0.10 | | $ 0.10 | $ 0.10 |
| **Total - 1000 - Cash and Equivalents** | $97,450.39 | $0.00 | | |
| **1100 - Accounts Receivable** | | | | |
| 1100 - Accounts Receivable | $844,777.43 | | $ 844,777.43 | $ 844,777.43 |
| 1110 - Allowance for Doubtful Accounts | | $35,220.35 | $ (35,220.35) | $ (35,220.35) |
| 1197 - Employee receivables | $113,182.24 | | $ 113,182.24 | $ 113,182.24 |
| **Total - 1100 - Accounts Receivable** | $957,959.67 | $35,220.35 | | |
| **1200 - Other Assets** | | | | |
| 1198 - Due from Employees | $2,104.63 | | $ 2,104.63 | $ 2,104.63 |
| 1199 - Loans to Officers | $243,724.87 | | $ 243,724.87 | $ 243,724.87 |
| 1205 - Other Receivable | $52,862.89 | | $ 52,862.89 | $ 52,862.89 |
| 1210 - Deposits on Account | $263,289.16 | | $ 263,289.16 | $ 263,289.16 |
| 1800 - Undeposited Funds | $11,553.00 | | $ 11,553.00 | $ 11,553.00 |
| **Total - 1200 - Other Assets** | $573,534.45 | $0.00 | | |
| **1220 - Prepaid Expenses** | | | | |
| 1220 - Prepaid Expenses | $33,942.14 | | $ 33,942.14 | $ 33,942.14 |
| 1221 - Prepaid Advertising | $5,388.93 | | $ 5,388.93 | $ 5,388.93 |
| 1222 - Prepaid Insurance | $37,988.99 | | $ 37,988.99 | $ 37,988.99 |
| 1223 - Software | $16,462.61 | | $ 16,462.61 | $ 16,462.61 |
| 1224 - Prepaid Loan Fees | $231,839.30 | | $ 231,839.30 | $ 231,839.30 |
| 1226 - Prepaid Shipping Inbound | $2,561.22 | | $ 2,561.22 | $ 2,561.22 |
| **Total - 1220 - Prepaid Expenses** | $328,183.19 | $0.00 | | |
| **1300 - Inventory Asset** | | | | |
| 1300 - Inventory Asset | $8,374.09 | | $ 8,374.09 | $ 8,374.09 |
| 1306 - Build Kits & Components | $615,420.25 | | $ 615,420.25 | $ 615,420.25 |
| **1320 - Frames** | | | | |
| 1320 - Frames | $554.60 | | $ 554.60 | $ 554.60 |
| 1330 - Frame - Hardtails | $247,250.20 | | $ 247,250.20 | $ 247,250.20 |
| 1340 - Frames - Full Suspension | $685,312.63 | | $ 685,312.63 | $ 685,312.63 |
| 1345 - Frames - Cross | $474,574.90 | | $ 474,574.90 | $ 474,574.90 |
| **Total - 1320 - Frames** | $1,407,692.33 | $0.00 | | |
| **1350 - Complete Bikes** | | | | |
| 1351 - Complete Bikes - Hardtails | $36,604.65 | | $ 36,604.65 | $ 36,604.65 |
| 1352 - Complete Bikes - Full Suspension | $405,400.10 | | $ 405,400.10 | $ 405,400.10 |
| 1353 - Complete Bikes - Cross | $101,631.31 | | $ 101,631.31 | $ 101,631.31 |
| **Total - 1350 - Complete Bikes** | $543,636.06 | $0.00 | | |
| 1360 - Forks | $378,720.58 | | $ 378,720.58 | $ 378,720.58 |
| **1370 - Parts & Accessories** | | | | |
| 1370 - Parts & Accessories | $29.14 | | $ 29.14 | $ 29.14 |
| 1371 - Misc Parts | $156,249.92 | | $ 156,249.92 | $ 156,249.92 |
| 1372 - Niner Clothing | $68,946.40 | | $ 68,946.40 | $ 68,946.40 |
| 1373 - Niner Merchandise | $7,925.08 | | $ 7,925.08 | $ 7,925.08 |
| 1374 - Niner Parts | $285,623.99 | | $ 285,623.99 | $ 285,623.99 |
| 1375 - Frames spare parts | $278,056.72 | | $ 278,056.72 | $ 278,056.72 |
| **Total - 1370 - Parts & Accessories** | $796,831.25 | $0.00 | | |
| 1378 - Wheelsets | $381,982.25 | | $ 381,982.25 | $ 381,982.25 |
| **1380 - Prepaid Inventory** | | | | |

# Niner, Inc.
## Assets & Tangible Property Listing
### Schedule 2.1 (a)

| Account | Debit | Credit | DR <OR> | TO BUYER |
|---|---|---|---|---|
| 29 - Inventory in Transit | $6,836.14 | | $ 6,836.14 | $ 6,836.14 |
| Total - 1380 - Prepaid Inventory | $6,836.14 | $0.00 | | |
| 1398 - Inventory in Transit | $3,689.12 | | $ 3,689.12 | $ 3,689.12 |
| Total - 1300 - Inventory Asset | $4,143,162.07 | $0.00 | | |
| 1400 - Property & Equipment | | | | |
| 1401 - Machinery and Equipment | | | | |
| 1401 - Machinery and Equipment | $178,625.32 | | $ 178,625.32 | $ 178,625.32 |
| 1402 - Computers | $119,981.24 | | $ 119,981.24 | $ 119,981.24 |
| 1404 - Storage Container | $3,494.21 | | $ 3,494.21 | $ 3,494.21 |
| 1405 - Trade Show Booth and Other | $321,807.31 | | $ 321,807.31 | $ 321,807.31 |
| 1408 - Shop Tools | $14,686.87 | | $ 14,686.87 | $ 14,686.87 |
| 1409 - Camera, Video & Other | $16,183.42 | | $ 16,183.42 | $ 16,183.42 |
| 1410 - Vehicles | $216,616.22 | | $ 216,616.22 | $ 216,616.22 |
| 1450 - Accumulated Depreciation PP&E | | $735,000.96 | $ (735,000.96) | $ (735,000.96) |
| 1550 - Test Frames and Components | $279,153.24 | | $ 279,153.24 | $ 279,153.24 |
| 1551 - Accumulated Depreciation - Test Frames and Components | | $221,905.61 | $ (221,905.61) | $ (221,905.61) |
| 1570 - Part Molds | | | | |
| 1570 - Part Molds | $1,709,591.74 | | $ 1,709,591.74 | $ 1,709,591.74 |
| Total - 1570 - Part Molds | $1,709,591.74 | $0.00 | | |
| 1571 - Accumulated Depreciation - Part Molds | | $1,285,325.22 | $ (1,285,325.22) | $ (1,285,325.22) |
| Total - 1401 - Machinery and Equipment | $2,858,138.57 | $2,242,231.69 | | |
| 1460 - Leasehold Improvements | | | | |
| 1460 - Leasehold Improvements | $69,107.15 | | $ 69,107.15 | $ 69,107.15 |
| 1461 - Accumulated Depreciation - LH | | $19,041.67 | $ (19,041.67) | $ (19,041.67) |
| Total - 1460 - Leasehold Improvements | $69,107.15 | $19,041.67 | | |
| 1500 - Research and Development | | | | |
| 1501 - Capitalized R&D | | | | |
| 1502 - Air 9 Carbon | $49,108.26 | | $ 49,108.26 | $ 49,108.26 |
| 1505 - Air 9 Carbon SL | $4,135.00 | | $ 4,135.00 | $ 4,135.00 |
| 1506 - Rip 9 Carbon | $11,776.00 | | $ 11,776.00 | $ 11,776.00 |
| 1508 - Sir 9 | $5,001.03 | | $ 5,001.03 | $ 5,001.03 |
| 1510 - Air 9 Alloy | $29,871.24 | | $ 29,871.24 | $ 29,871.24 |
| 1511 - EMD | $3,404.48 | | $ 3,404.48 | $ 3,404.48 |
| 1512 - Jet Carbon | $110,079.26 | | $ 110,079.26 | $ 110,079.26 |
| 1513 - RIP 9 | $2,016.88 | | $ 2,016.88 | $ 2,016.88 |
| 1520 - Components | $43,974.40 | | $ 43,974.40 | $ 43,974.40 |
| 1569 - Accumulated Amortization - R&D | | $259,366.52 | $ (259,366.52) | $ (259,366.52) |
| Total - 1501 - Capitalized R&D | $259,366.55 | $259,366.52 | | |
| Total - 1500 - Research and Development | $259,366.55 | $259,366.52 | | |
| 1600 - Software | | | | |
| 1600 - Software | $361,926.93 | | $ 361,926.93 | $ 361,926.93 |
| 1609 - Acc. Amortization - Software | | $290,420.94 | $ (290,420.94) | $ (290,420.94) |
| Total - 1600 - Software | $361,926.93 | $290,420.94 | | |
| Total - 1400 - Property & Equipment | $3,548,539.20 | $2,811,060.82 | | |
| 1700 - Intellectual Property | | | | |
| 1771 - Patents | $129,555.16 | | $ 129,555.16 | $ 129,555.16 |
| 1772 - Trademarks | $16,550.82 | | $ 16,550.82 | $ 16,550.82 |
| 1779 - Accumulated Amortization - IP | | $44,768.04 | $ (44,768.04) | $ (44,768.04) |
| Total - 1700 - Intellectual Property | $146,105.98 | $44,768.04 | | |

**NINER, INC.**
Listing of Leases
Schedule 2.1 (b)

| Property Address | Tenant | Landlord |
|---|---|---|
| 2330 E PROSPECT RD, STE A<br>FORT COLLINS, CO 80525 | NINER, INC. | DMIG, LLC  P.O. Box 609<br>DEL MAR, CA 92014 |
| NO 573-1 JIAN KUO ROAD<br>WU CHU LI DA JIA DISTRICT<br>TAICHUNG CITY, TAIWAN R.O.C. | NINER TAIWAN OFFICE | Liao Hsin Nong<br>No.: 208 Dur Xing Road<br>Dajia District, Taichung City<br>Taiwan |

**NINER, INC.**
Assigned Contracts
Schedule 2.1 (c)

| Name | Type |
|------|------|
| KIRT VOREIS | PRO ATHLETE |
| REBECCA RUSCH | PRO ATHLETE |
| FORT COLLINS OFFICE | PREMESIS LEASE |
| TAIWAN OFFICE | PREMESIS LEASE |

**NINER, INC.**
Listing of Permits
Schedule 2.1 (d)

TRANSFERRED PERMITS:

None.

NINER, INC.
Listing of Patents
Schedule 2.1e

| AHMRT Ref. | Title | Application No. | Filing Date | Patent # | Issue Date | Niner | Expiration |
|---|---|---|---|---|---|---|---|
| 9ER07301 | Bicycle Rear Suspension | 12/116,077 | 5/6/2008 | 7934739 | 5/3/2011 | | |
| 9ER07301CIP | Bicycle Rear Suspension | 13/097,640 | 4/29/2011 | 8590914 | 11/26/2013 | Appvd 10/21/13 | 6/12/2029 |
| 9ER07302 | Bicycle Eccentric Bottom Bracket | 12/030,133 | 2/12/2008 | 8561498 | 10/22/2013 | | |
| 9ER09301 | Crown-Holding Head Cap | 11/350,582 | 2/8/2006 | 7703786 | 4/27/2010 | Appvd 10/22/13 | |
| 9ER10301 | Internal Cable Routing System | 13/184,099 | 7/15/2011 | 8662519 | 3/4/2014 | | |

NINER, INC.
Listing of Trademarks
Schedule 2.1e

| Mark | USA | CTM | China | Taiwan | Japan |
|---|---|---|---|---|---|
| | | | | | |
| **CVA** | | | | | |
| Status | Registered | Registered | Registered | Registered | Registered |
| Reg # | 4416714 | 11/6/2012 | 6/28/2012 | 6/27/2012 | 2/8/2013 |
| Reg Date | 10/15/2013 | | | | |
| Serial # | 85505162 | 10993673 | 11133945 | 101036186 | 6555599 |
| Filing Date | 12/28/2011 | | | | |
| Renewal Due | | 6/26/2022 | 3/8/2024 | 7/15/2023 | 2/8/2023 |
| | | | | | |
| **Stylized 9** | | | | | |
| Status | Registered | Registered | Pending | Registered | Registered |
| Reg # | 4150371 | 11000197 | | 101036189 | 5579600 |
| Reg Date | 8/14/2012 | 11/21/2012 | | 8/27/2012 | 5/2/2013 |
| Serial # | 85505141 | | 11133944 | | |
| Filing Date | 12/28/2011 | | 6/28/2012 | | |
| Renewal Due | 8/14/2018 | 6/28/2022 | | 7/15/2023 | 5/2/2023 |
| | | | | | |
| **Niner Bikes** | | | | | |
| Status | Registered | Registered | Pending | Registered | Registered |
| Reg # | 4267042 | 10993509 | | 1686690 | 5579601 |
| Reg Date | 1/1/2013 | | | 7/16/2013 | 5/2/2013 |
| Serial # | 85505119 | | 11133943 | | |
| Filing Date | 12/28/2011 | 11/5/2012 | 6/28/2012 | | |
| Renewal Due | | 6/28/2022 | | 7/15/2023 | 5/2/2023 |
| | | | | | |
| **Pedal Damn It** | | | | | |
| Status | Registered | Registered | Pending | Registered | Registered |
| Reg # | 4150364 | 10993442 | | 1660241 | 5555600 |
| Reg Date | 8/14/2012 | 11/6/2012 | | 1/16/2013 | 2/8/2013 |

NINER, INC.
Listing of Trademarks
Schedule 2.1e

| Mark | USA | CTM | China | Taiwan | Japan |
|---|---|---|---|---|---|
| Serial # | 85505082 | | 11133942 | | |
| Filing Date | 12/28/2011 | | 8/28/2012 | | |
| Renewal Due | 8/14/2018 | 6/26/2022 | | 1/15/2023 | 2/8/2023 |
| | | | | | |
| **CYA** | | | | | |
| Status | Registered | | | | |
| Reg # | 4213080 | | | | |
| Reg Date | 9/25/2012 | | | | |
| Serial # | 85505200 | | | | |
| Filing Date | 12/28/2011 | | | | |
| Renewal Due | | | | | |
| | | | | | |
| **The Big Revolution** | | | | | |
| Status | Registered | | | | |
| Reg # | 3331235 | | | | |
| Reg Date | 11/6/2007 | | | | |
| Serial # | 78667829 | | | | |
| Filing Date | 7/11/2005 | | | | |
| Renewal Due | | | | | |
| | | | | | |
| **NINERD** | | | | | |
| Status | Registered | | | | |
| Reg # | 4595666 | | | | |
| Reg Date | 9/2/2014 | | | | |
| Serial # | 86040259 | | | | |
| Filing Date | 8/16/2013 | | | | |
| Renewal Due | | | | | |
| | | | | | |
| **Pedal Damn It** | | | | | |
| Status | Pending | | | | |
| Reg # | | | | | |
| Reg Date | | | | | |
| Serial # | 86317766 | | | | |
| Filing Date | 6/23/2014 | | | | |
| Renewal Due | | | | | |
| | | | | | |
| **Stylized 9** | | | | | |
| Status | Pending | | | | |
| Reg # | | | | | |
| Reg Date | | | | | |
| Serial # | 86317769 | | | | |
| Filing Date | 6/23/2014 | | | | |
| Renewal Due | | | | | |

NINER, INC.
Eligible Inventory
Schedule 2.1 (f)

### Niner Bikes
## PMC 4.1A Inventory Valuation - FoCo
### As of November 20, 2017

| Item | Display Name | Inv. Value | On Hand | Ave Cost |
|---|---|---|---|---|
| 1300 - Inventory Asset | | | | |
| 1306 - Build Kits & Components | | $582,733 | 23,647 | $25 |
| 1320 - Frames | | $1,183,947 | 2,185 | $542 |
| 1350 - Complete Bikes | | $299,604 | 224 | $1,338 |
| 1360 - Forks | | $334,657 | 1,665 | $201 |
| 1370 - Parts & Accessories | | $702,675 | 62,603 | $11 |
| 1378 - Wheelsets | | $345,987 | 1,541 | $225 |
| Total - 1300 - Inventory Asset | | $3,449,602 | 91,865 | $38 |
| Total | | $3,449,602 | 91,865 | $38 |

### Niner Bikes
## PMC 4.1B Inventory Valuation - KN, Presale, Warran
### As of November 20, 2017

| Item | Display Name | Inv. Value | On Hand | Ave Cost |
|---|---|---|---|---|
| 1300 - Inventory Asset | | | | |
| 1306 - Build Kits & Components | | $207 | 22 | $9 |
| 1320 - Frames | | $29,917 | 53 | $564 |
| 1350 - Complete Bikes | | $29,864 | 17 | $1,757 |
| 1360 - Forks | | $1,034 | 6 | $172 |
| 1370 - Parts & Accessories | | $8,195 | 513 | $16 |
| 1378 - Wheelsets | | $821 | 4 | $205 |
| Total - 1300 - Inventory Asset | | $70,037 | 615 | $114 |
| Total | | $70,037 | 615 | $114 |

$3,519,639

**NINER, INC.**
Eligible Inventory
Schedule 2.1 (f)

## Niner Bikes
## PMC 5 Inventory Valuation - OTW
## As of November 20, 2017

| Item | Display Name | Inv. Value | On Hand | Avg Cost |
|---|---|---|---|---|
| - Unassigned - | | $74,458 | 4,636 | $16 |
| Mr. Control | | $3,134 | 1,865 | $2 |
| RACE FACE | | $5,396 | 360 | $15 |
| Very Impressive Product Co., Ltd. | | $66,406 | 140 | $474 |
| Astro Engineering Co., Ltd. | | $43,045 | 114 | $378 |
| ENVE | | $5,534 | 5 | $1,107 |
| Total | | $197,972 | 7,020 | $28 |

## Niner Bikes
## PMC 5.1 Inventory Valuation - Factory Dropship
## As of November 20, 2017

| Item | Display Name | Inv. Value | On Hand | Avg Cost |
|---|---|---|---|---|
| - Unassigned - | | $1,583 | 484 | $3 |
| Total | | $1,583 | 484 | $3 |

| | | | | |
|---|---|---|---|---|
| Total | | $199,555 | | |

**NINER, INC.**
Eligible Inventory
Schedule 2.1 (f)

Niner Bikes
PMC 6 Demo Listing

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1300 - Inventory Asset | | | | | | | | | | | | | |
| 1320 - Complete Bikes | 0.00 | $0 | 0.00 | $0 | 53.00 | $74,623 | 0.00 | $0 | 18.00 | $37,464 | 0.00 | 52.00 | $112,388 |
| 1370 - Parts & Accessories | 0.00 | $0 | 0.00 | $0 | 1.00 | $286 | 0.00 | $0 | 0.00 | $0 | 0.00 | 1.00 | $286 |
| 1366 - Build Kits & Components | | | | | 20.00 | $825 | | | | | | 20.00 | $825 |
| Total - 1300 - Inventory Asset | 0.00 | $0 | 0.00 | $0 | 54.00 | $75,635 | 0.00 | $0 | 18.00 | $37,464 | 0.00 | 73.00 | $113,209 |
| Total | 0.00 | $0 | 0.00 | $0 | 54.00 | $75,635 | 0.00 | $0 | 18.00 | $37,464 | 0.00 | 73.00 | $113,209 |

Total Demo  $  113,209

**NINER, INC.**
Excluded Assets
Schedule 2.2(k)

None.

# NINER, INC.
### Assumed Liabilities
### Schedule 2.3

None.

NINER, INC.
Excluded Liabilities
Schedule 2.4

All liabilities other than the Assumed Liabilities, including all claims, demands, or litigation asserted against, accruing, or arising against Seller prior to the Closing Date.

Any claim, demand, or litigation asserted against, accruing, or arising against Seller associated with the Excluded Liabilities and Excluded Assets.

Any Encumbrance that is not a Permitted Encumbrance.

**NINER, INC.**
Budget
Schedule 2.6

**NINER, INC.**
Schedule of Forecasted Cash Disbursements
as of 10 Nov 2017

| | Proj Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cal Week | 46 | 47 | 48 | 49 | 50 | 51 | 52 | 1 | 2 | 3 | 4 | 5 | 6 |
| | | 17-No | 24-No | 1-Dec | 8-Dec | 15-Dec | 22-Dec | 29-Dec | 5-Jan | 12-Jan | 19-Jan | 26-Jan | 2-Feb | 9-Feb |
| **Inventory Vendors** | | | | | | | | | | | | | | |
| Subtotal - Wires | | 56,399 | 4,444 | 41,534 | 126,773 | 49,791 | 5,000 | -5,000 | 477,252 | 204,982 | 5,000 | 5,000 | 190,988 | 318,057 |
| Subtotal - Checks | | 101,283 | 6,180 | 146,200 | 0 | 157,256 | 0 | 43,376 | 0 | 175,532 | 0 | 0 | 5,885 | 36,887 |
| *Disbursement to Suppliers* | | 157,682 | 10,624 | 187,734 | 126,773 | 207,047 | 5,000 | 48,376 | 477,252 | 380,514 | 5,000 | 5,000 | 196,873 | 354,944 |
| **SG&A Vendors** | | | | | | | | | | | | | | |
| Payroll | | | | | | | | | | | | | | |
| Payroll Taxes | | 23,078 | 0 | 20,500 | 14,535 | 25,500 | 5,000 | 20,500 | 19,528 | 30,500 | 20,000 | 20,500 | 20,000 | 20,000 |
| FedEx/FNYTrans Trade & UPS | | | | | | | | | | | | | | |
| Chase CC / FNMC / Amex | | 0 | 44,754 | 15,000 | 24,000 | 13,586 | 15,000 | 5,000 | 44,000 | 20,000 | 35,000 | 20,000 | 33,000 | 35,000 |
| William Cheng semi/mo - Tung/mo | | | 0 | | | 15,000 | 10,000 | 15,000 | | 35,000 | 10,000 | 35,000 | | |
| Medical Insurance | | | | | | | | | | | | | | |
| Rent | | | 25,000 | 24,925 | 25,000 | | 25,000 | | 24,925 | | | | 24,925 | |
| Other | | | | 26,751 | | | | | 26,751 | | | | 26,751 | |
| West Town Savings Bank | | | 10,000 | 10,000 | | | | | 10,000 | | | 10,000 | 10,000 | |
| Bank & Credit Card Fees | | 3,600 | | | | 3,600 | | | | 2,500 | 1,100 | | | |
| Misc. Disbursements | | 6,933 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Loan, Interest | | | | | | | | | | | | | | |
| *Disbursements to SG&A Vendors* | | 33,611 | 73,754 | 158,206 | 73,535 | 150,886 | 65,000 | 101,530 | 135,204 | 181,200 | 76,100 | 135,530 | 130,676 | 65,000 |
| **Outflows: Total** | | 198,226 | 100,378 | 355,940 | 210,308 | 367,933 | 80,000 | 169,906 | 622,456 | 571,714 | 91,100 | 151,530 | 337,549 | 429,944 |



**Cash Outflows**

700,000
600,000
500,000
400,000
300,000
200,000
100,000

17-Nov  24-Nov  1-Dec  8-Dec  15-Dec  22-Dec  29-Dec  5-Jan  12-Jan  19-Jan  26-Jan  2-Feb  9-Feb

■ Disbursement to Suppliers    ▨ Disbursements to SG&A Vendors    — Outflows: Total

**NINER, INC.**
**Required Consents**
Schedule 3.3


None.

**NINER, INC.**
Material Contracts
Schedule 3.5(a)

| Name | Type |
|------|------|
| KIRT VOREIS | PRO ATHLETE |
| REBECCA RUSCH | PRO ATHLETE |
| FORT COLLINS OFFICE | PREMESIS LEASE |
| TAIWAN OFFICE | PREMESIS LEASE |

**NINER, INC.**
Cure Amounts
Schedule 3.5(b)

| | |
|---|---|
| KIRT VOREIS | $1,400 |
| REBECCA RUSCH | $1,146 |
| FORT COLLINS OFFICE | $21,908 |
| TAIWAN OFFICE | $777 |

**NINER, INC.**
Material Permits
Schedule 3.7(b)

| Jurisdiction | Permit Type | Permit |
| --- | --- | --- |
| California | Seller's Permit | 100567872 |
| Colorado | Sales Tax License | 03508859-0000 |
| Fort Collins | Sales/Use Tax License | 52657 |

**NINER, INC.**
Material Environmental Permits
Schedule 3.8 (b)


NONE.

**NINER, INC.**
Taxes
Schedule 3.9 (a)


NONE.

**NINER, INC.**
Intellectual Property
Schedule 3.10 (a)

SEE SCHEDULE 2.1(e)

**NINER, INC.**
Infringements
Schedule 3.10 (c)

NONE.